544 A.2d 8

**Bernard WIGGINS**

v.

**STATE of Maryland.**

**No. 1676, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

July 15, 1988.

Certiorari Granted Oct. 26, 1988.

José Felipé Anderson and George E. Burns, Jr., Asst. Public Defenders (Alan H. Murrell, Public Defender, on the brief) Baltimore, for appellant.

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, Alexander Williams, Jr., State's Atty., and A. Thomas Krehely, Asst. State's Atty. for Prince George's County, Upper Marlboro, on the brief), for appellee.

Argued before WILNER and BISHOP, JJ., and JAMES S. GETTY, Associate Judge of the Court of Special Appeals (retired), Specially Assigned, JJ.

BISHOP, Judge.

Bernard Wiggins was convicted by a jury in the Circuit Court for Prince George's County of first degree felony murder, robbery with a deadly weapon, and theft over $300.00. He was sentenced to life imprisonment on the felony murder charge and given a twenty year consecutive sentence for the robbery with a deadly weapon charge.[1] On appeal he asks:

I. Did the trial court err when it denied Appellant's motion to suppress?

II. Did the trial court err when it permitted Appellant to be escorted before the jury by Court Security officers wearing plastic gloves?

III. Was the evidence sufficient to sustain Appellant's convictions?

---

1. The theft charge merged with the robbery conviction.

The first witness who testified at appellant's trial was James Smith, the maintenance supervisor of the complex where the apartment of the victim, Bjorn Haug, was located. Smith testified that on the morning of March 30, 1987, he received a call from Haug's employer requesting that he obtain a passkey and check on Haug since it was highly unusual for him to miss work. Smith testified that after obtaining permission to enter the apartment from the property's management company, he knocked on Haug's door and received no response. Not finding Haug in either the tenants' laundry room or the storage area, he unlocked the door to Haug's apartment, entered the apartment, and searched for Haug without success. While in Haug's apartment, he noticed it was uncharacteristically out of order and described it as being in "complete disarray."

After he searched Haug's apartment, Smith returned to the maintenance office and telephoned the property management company to report what he had seen. The property manager then called the police, who met Smith at Haug's apartment.

Corporal Paul Noblitt of the Prince George's County Police Department testified that he was the lead investigator of a homicide that took place at the F.L. Watkins Construction Company in Seat Pleasant, Maryland. Noblitt told the jury that on March 30, 1987, when he arrived at the scene, he "found the body of a white male, approximately 48 years of age ... adjacent to a dumpster ... with a length of pipe imbedded in the victim's face." Noblitt testified that the victim was identified as Bjorn Haug.

Noblitt also stated that on April 1, 1987, the D.C. Metropolitan Police Department stopped an individual named Erik Jennifer, who was operating Haug's vehicle. On the basis of a statement obtained from Jennifer, a search warrant was obtained by the D.C. Police Department for an apartment located at 1346 Good Hope Road, which appellant shared with two other people. While in appellant's apartment, Noblitt and some officers from the D.C. Police Department searched for the items listed in the search war-

rant: "stero [sic] equipment consisting of a Dule [sic] Cassett [sic] Player, Reel-to-Reel Tape Player, Amplifier, Turn Table [sic], cordless phone and a Gray [sic] Naylon [sic] bag with the handles and a zipper." During the search, the police seized a telephone which matched the description in the warrant and a number of other items not specifically listed in the warrant but which were identified at trial as having belonged to appellant.[2] In particular, the State introduced, over objection, two coin sets and an ashtray which were recovered from appellant's bedroom. Appellant and one of the other residents of the Good Hope Road apartment, Jacquelyn Cooper, were present when the search warrant was executed. They were taken into custody. The third resident of the apartment, Juan Gough, was taken into custody at a telephone booth near the apartment.

As a condition of their plea agreement, Cooper and Gough testified at appellant's trial. Gough stated that on the night of the murder he and Jennifer were in his bedroom watching television when appellant, Cooper, and the victim entered. He testified that appellant and the victim went into Cooper's bedroom. Later, appellant came out of the bedroom and told him and Jennifer "that he was going to knock the guy off and take the car." Gough stated that he remained in his room with Jennifer. He continued talking with Cooper, who was standing in the doorway, because he didn't pay any attention to appellant since "he jokes around sometimes about things." Gough said that he then heard glass break and that he, Jennifer and Cooper went to see what had happened. When they got to the doorway of Cooper's bedroom, they observed through the open door that the victim was "knocked out" and "bloody." According to Gough, the appellant told him, Jennifer, and Cooper that they had to "help him take the guy out of there because [they] were there at the time it happened." Gough

---

**2.** Those items seized but not specifically described in the warrant include: a safe containing personal papers of the appellant; two bottles of champagne; a stamp collection; a Polaroid camera with case; a razor; two flashlights and a wristwatch.

testified that while appellant went outside to drive the victim's car to the back of the apartment, the three of them lifted the victim out of the bedroom and carried the unconscious body down to the car. They placed it in the trunk, entered the car and were driven away by appellant. Gough also stated that when appellant heard the victim "thumping" in the truck he realized that the victim had regained consciousness. They then drove to a vacant lot. When the trunk was opened the victim emerged and pleaded for mercy. Gough stated that appellant instructed them to "find something to hit the guy with" and that he, appellant and Cooper all picked up sticks. Gough admitted striking the victim once with a stick but said he immediately dropped it and ran back to the car where he was joined by Cooper and Jennifer. From his position inside the car, Gough stated that he observed appellant "swinging downward" toward the victim and then, when appellant re-entered the vehicle, the four of them returned to the Good Hope Road Apartment. After returning to the apartment, Gough said, appellant stated that he had the victim's address and suggested that they go to the victim's apartment. The four of them ransacked the victim's apartment and transported the stolen items to their Good Hope Road apartment. Cooper's testimony was, in substance, the same as Gough's. Other relevant facts will be developed in the context of addressing appellant's arguments.

## I.

### Motion to Suppress

Appellant argues that the items seized from the Good Hope Road apartment which were not enumerated in the search warrant should have been suppressed.[3] The State responds that the items seized fall within the "plain view" doctrine and are thereby exempt from the warrant requirement. Alternatively, the State argues that even if the

---

**3.** *See* note 2, *supra*.

items should have been suppressed, their admission was harmless beyond a reasonable doubt because the evidence was merely cumulative with that which was seized under the warrant.

In *Coomes v. State*, 74 Md.App. 377, 387, 537 A.2d 1208 (1988), we held that "in order to justify a warrantless seizure pursuant to the plain view doctrine" the State must:

(1) demonstrate that the police had a prior valid justification for the intrusion;

(2) prove circumstances which show that the evidence seized was found inadvertently;

(3) show that the evidence was in plain view; and

(4) show that the evidence was such that the police were immediately aware of its significance.

In the case *sub judice*, the State has failed to present any evidence to satisfy its burden of proof regarding either inadvertence or plain view, and based on our review of the record, the State did not even make any real effort to obtain evidence for such support. Nonetheless, we do not conclude that reversal of appellant's conviction is mandated because the seized evidence, although erroneously admitted, was cumulative.

The standard of review when determining "harmless error" in criminal cases was discussed in *Brooks v. State*, 299 Md. 146, 156, 472 A.2d 981 (1984). There the Court said:

In *Dorsey v. State*, 276 Md. 638, 350 A.2d 665 (1976) we concluded

"that when an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt,that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contribut-

ed to the rendition of the guilty verdict." *Id.* at 659, 350 A.2d 665.

We refined this standard in *Ross v. State*, 276 Md. 664, 350 A.2d 680 (1976) where we said:

> "The essence of this test is the determination whether the cumulative effect of the properly admitted evidence so out-weighs the prejudicial nature of the evidence erroneously admitted that there is *no reasonable possibility that the decision of the finder of fact would have been different had the tainted evidence been excluded.*" *Id.* at 674, 350 A.2d 680 [emphasis added in *Brooks* ].

299 Md. at 156, 472 A.2d 981. In view of the fact that the State did introduce evidence legitimately seized pursuant to the warrant, and in light of the testimony of appellant's accomplices Cooper and Gough, we conclude that there is "no reasonable possibility that the decision of the finder of fact would have been different had the tainted evidence been excluded."

## II.

### The Gloves

■ Appellant contends that his rights of due process and to fundamental fairness were violated because the trial judge allowed courtroom security personnel to wear gloves while escorting him in and out of the courtroom.[4] The following discussion, between counsel and the court, occurred on the morning of the trial:

> (Counsel approached the bench and the following ensued:)

> THE COURT: For the purposes of the record, I was informed this morning that there is a strong possibility or probability—I don't really know because nobody knows—

---

4. Addressing this issue, the American Civil Liberties Union Fund of the National Capital Area, and the American Public Health Association jointly submitted a brief as *amici curiae* which greatly assisted this Court.

that there is a question as to whether or not the defendant has the disease called AIDS.

I have given the clerk of this court and the sheriff of this court the authority to wear gloves. I also do not intend to jeopardize the safety of any jurors in this case and, accordingly, the exhibits in this case will not be handled by the jury. Now, after that [is] put on the record [is there] anything you want to put on[?]

MR. DREW [Counsel for Appellant]: Your Honor, I would object to the defendant being brought into the courtroom by the sheriffs in gloves. The sheriffs on previous occasions have brought him into the courtroom without the benefit of gloves or any other procedures to protect themselves.

I appreciate the concern of the Court. However, if there was a concern whatsoever in terms of this particular individual being in a courtroom, then it would have been more appropriate, I believe, to check with the Detention Center to determine whether or not he had been tested for AIDS and to determine whether or not he in fact has been diagnosed as having AIDS.

THE COURT: Mr. Krehely, put on the record what you know about this man's medical condition.

MR. KREHELY [Counsel for the State]: Your Honor, what the State knows is that, one, the victim has been diagnosed as having AIDS by the Medical Examiner. Two, one of the codefendants Juan Gough has also been diagnosed as at least carrying the virus. He doesn't have the actual disease yet but has been diagnosed as carrying whatever they call the virus. As far as the defendant is concerned, it is my understanding that he had been hospitalized recently for at least a week.

MR. DREW: That's correct.

MR. KREHELY: As to the status of his condition as to whether or not he has AIDS, the hospital doesn't give our office that information so I am unable to confirm it.

THE COURT: Fine. It is all on the record. Let's go.

On the second day of appellant's trial, there was another objection to the courtroom procedures:

(The jury returned to the courtroom.)

MR. DREW: Your Honor, may we approach the bench?

THE COURT: Come up.

(Counsel approached the bench and the following ensued:)

MR. DREW: Your Honor, at yesterday's proceeding I objected to the procedure of the deputies bringing the defendant in wearing gloves. Today we have eliminated that to a certain extent in that the defendant was brought in prior to the jury being brought in. However, the deputies are still wearing gloves.

I would object to the procedure of the deputies wearing gloves in the courtroom seated behind the defendant as a result of any inferences that they may draw concerning him and any thoughts that they may have in that regard.

I would alert the Court that I have reviewed some of the law, and I believe that it may be a basis for a motion for a mistrial, which I would make at this time, if the Court does not direct that the deputies after they have brought him in do not remove their gloves to avoid any adverse effects on the defendant's rights.

THE COURT: I have no intention of ever removing their gloves, and, therefore, your motion for mistrial is denied.

Lastly, in arguing his motion for a new trial, counsel for the appellant stated:

\* \* \* \* \* \*

Additionally, [regarding] the matter of Mr. Wiggins being paraded back and forth in front of the jury [with] the deputies wearing gloves, I believe that procedure in and of itself was so inherently prejudicial as to deprive him of a fair trial in this case. That coupled with the co-defendant testimony ... resulted in a conviction in this particular case. For those reasons, I believe Mr. Wiggins is entitled to a new trial.

THE COURT: All right. That's denied.

The wearing of gloves by courtroom security personnel is wholly inconsistent with the current theories concerning AIDS transmission. For example, the *Surgeon General's Report on Acquired Immune Deficiency Syndrome* (October, 1986) definitively states that:

> AIDS is *not* spread by common everyday contact but by sexual contact (penis-vagina, penis-rectum, mouth-rectum, mouth-vagina, mouth-penis). Yet there is great misunderstanding resulting in unfounded fear that AIDS can be spread by casual, non-sexual contact. The first cases of AIDS were reported in this country in 1981. We would know by now if AIDS were passed by casual, non-sexual contact. (Emphasis in original.)

Similarly, here in Maryland, the Executive Summary to the *Report of the Governor's Task Force on Acquired Immune Deficiency Syndrome* (December, 1986) contains the following findings:

> The methods of transmitting HIV infection are established to be through intimate sexual contact or through the exchange of blood and blood products infected with HIV.

> HIV infection is difficult to acquire and not transmitted by social or casual contacts, as shown in many significant studies of household members and health care workers.

Furthermore, in *In Re Peacock*, 59 B.R. 568 (Bkrtcy.S.D. Fla.1986), the Court was confronted with the question of whether special precautions were necessary for the courtroom since the bankrupt was diagnosed as a victim of "pre-AIDS syndrome." In concluding that no special precautions were necessary, the court relied upon a letter from a medical epidemiologist with the Center for Disease Control, which provided:

> Dear Judge Cristol:

> Your request for information has been referred to me for reply.

The cause of the acquired immunodeficiency syndrome (AIDS) has been found to be a virus known as human T-lymphotropic virus, type III or lymphadenopathy associated virus (HTLV–III/LAV). HTLV–III/LAV can be transmitted through sexual contact or through blood products or blood. We have no evidence that it can be transmitted through air, food, water, inanimate objects, or casual contact.

We have no recommended special precautions for courtroom proceedings where one or more of the participants has AIDS. I know of no usual courtroom procedure that would result in transmission of HTLV–III/LAV.

\* \* \* \* \* \*

Nevertheless, we are not persuaded that the trial judge's cautious actions require reversal. Appellant argues that the prejudicial inferences from the wearing of the gloves by the courtroom security personnel are: (1) that appellant had AIDS or the HIV virus; (2) that appellant was homosexual; and/or (3) that appellant was an intravenous drug user. That the wearing of gloves by the deputies had any prejudicial effect on the defendant is not supported by any evidence in the record. Appellant conceded as much at oral argument. We also note, however, that otherwise independent evidence bearing on these three inferences was presented to the jury. During *voir dire* the court addressed the jury:

This case has touches of homosexuality in it. Would that prejudice any member of the jury so that they could not fairly and impartially decide the case based solely on the evidence they are going to hear in this courtroom? If that applies to anybody, come up and tell me about it here. All right.

There was no response from the jury. In addition, both Cooper and Gough testified that the reason appellant and the victim returned to the Good Hope Road apartment was to engage in sexual relations. This was preceded by Nob-

litt's testimony that the victim tested positive for AIDS. With reference to drug use, there was testimony that after appellant, Gough, Cooper and Jennifer dropped the victim's body off at the dumpster they all smoked a joint of PCP while they drove back to the Good Hope Road apartment.

We conclude that there is "no reasonable possibility that the decision of the finder of fact would have been different" had the security personnel not worn gloves.

## III.

### Sufficiency of the Evidence

■ Appellant's final contention is that there was insufficient evidence to corroborate the accomplices' testimony. He acknowledges that the corroborative evidence "need not of itself be sufficient to convict the accused, but need only support some of the material points of the accomplice's testimony." *Harriday v. State*, 228 Md. 593, 598, 182 A.2d 40 (1962). In *Brown v. State*, 281 Md. 241, 244, 378 A.2d 1104 (1977), the Court held that corroborative evidence must:

> relate to material facts tending either (1) to identify the accused with the perpetrators of the crime or (2) to show the participation of the accused in the crime itself. If with some degree of cogency the corroborative evidence tends to establish either of these matters, the trier of fact may credit the accomplice's testimony even with respect to matters as to which no corroboration was adduced. That corroboration need not extend to every detail and indeed may even be circumstantial is also well settled by our cases. (Citations omitted.)

The State corroborated the testimony of appellant's accomplices, Cooper and Gough, through the introduction of items of the victim's property seized under the search warrant.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.