554 A.2d 356

**Bernard WIGGINS**

v.

**STATE of Maryland.**

**No. 94, Sept. Term 1988.**

Court of Appeals of Maryland.

March 7, 1989.

234

José Felipé Anderson, and George E. Burns, Jr., Asst. Public Defenders (Alan H. Murrell, Public Defender, on brief), Baltimore, for petitioner.

Susan Goering, Baltimore, Elizabeth Symonds and Arthur B. Spitzer, Washington, D.C., Nan Hunter, William Rubenstein and Judith Levin of New York City, amicus curiae for The American Civil Liberties Union, the American Civil Liberties Union of Maryland, The American Civil Liberties Union of the Nat. Capital Area, and the American Public Health Ass'n.

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief) Baltimore, for respondent.

Argued before ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS, BLACKWELL, JJ., and

CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals of Maryland (retired) specially assigned.

CHARLES E. ORTH, Jr. (Ret.), Specially Assigned, Judge.

The specter of the dread disease AIDS [1] hovered over the trial of Bernard Wiggins in a criminal cause before a jury in the Circuit Court for Prince George's County. The trial judge refused to exorcise it. The jury convicted Wiggins of felony murder (life imprisonment); robbery with a deadly weapon (20 years consecutive); and felony theft (merged into the murder conviction). Wiggins claims that the menacing spirit denied him a fair trial. He seeks a new trial free of that prejudice.

## I

The tragedy played in this case is peopled with homosexuals and lesbians. Wiggins, a homosexual, Juan Demetrious Gough, a homosexual, and Jacquelyn M. Cooper, a lesbian, lived together in an apartment in the District of Columbia. In a pub on the night of the murder, Bjorn Haug solicited Cooper, thinking she was a male. She suggested that he meet Wiggins. Haug went with Cooper and Wiggins to their ménage à trois. Gough and his lover, one Eric Jennifer, were there. Wiggins and Haug went into Wiggins' bedroom. Wiggins was heard to say that he "was going to knock the guy off and take the car...." There was a loud crash and Gough saw Haug in the bedroom "knocked out" and "bloody." Wiggins, Gough, Jennifer, and Cooper carried Haug to his car and put him in the trunk. After driving around for a time (Wiggins was at the wheel), they

---

1. "AIDS" is the now well-known acronym for acquired immunodeficiency syndrome. It is caused by a virus known as human T-lymphotopic virus, type III or lymphadenopathy associated virus (HTLV–III/LAV). The virus is also commonly referred to as the human immunodeficiency virus (HIV). Institute of Medicine, Nat'l Academy of Sciences, *Confronting AIDS: Directions for Public Health, Health Care, and Research* at 38–39 (1986).

heard thumping from the trunk. Wiggins pulled over to a vacant lot in Prince George's County, Maryland, and let Haug out of the trunk. At Wiggins' repeated urging Gough and Cooper tried without much success to beat Haug with sticks. They returned to the car. Gough saw Wiggins "swing down" at Haug. Leaving Haug, Gough, Cooper, and Jennifer went to Haug's apartment and removed a number of items. Subsequently, Haug was found on the lot. He was dead. A length of pipe was imbedded in his face.[2]

## II

When Wiggins' case came on for trial in November 1987, he was escorted into the courtroom by guards wearing rubber gloves. The jury was present. At a bench conference there was the following colloquy:

THE COURT: For the purposes of the record, I was informed this morning that there is a strong possibility or probability—I don't really know because nobody knows— that there is a question as to whether or not the defendant has the disease called AIDS.

I have given the clerk of the court and the sheriff of this court the authority to wear gloves. I also do not intend to jeopardize the safety of any jurors in this case and, accordingly, the exhibits in this case will not be handled by the jury. Now, after that put on the record anything you want to put on.

DEFENSE COUNSEL: Your Honor, I would object to the defendant being brought into the courtroom by the sheriffs in gloves. The sheriffs on previous occasions have brought him into the courtroom without the benefit of gloves or any other procedures to protect themselves.

---

2. What we have recounted above represents the testimony of Gough and Cooper. Each of Gough and Cooper had entered into a plea agreement with the State. Their testimony was a condition of the agreement.

I appreciate the concern of the Court. However, if there was a concern whatsoever in terms of this particular individual being in a courtroom, then it would have been more appropriate, I believe, to check with the Detention Center to determine whether or not he had been tested for AIDS and to determine whether or not he in fact has been diagnosed as having AIDS.

The judge asked the State's Attorney to "put on the record what you know about this man's medical condition." The State's Attorney replied:

Your Honor, what the State knows is that, one, the victim [Haug] has been diagnosed as having AIDS by the Medical Examiner. Two, one of the codefendants Juan Gough has also been diagnosed as at least carrying the virus. He doesn't have the actual disease yet but has been diagnosed as carrying whatever they call the virus. As far as the defendant is concerned, it is my understanding that he had been hospitalized recently for at least a week.

But the State's Attorney did not know "the status of his condition as to whether or not he has AIDS. . . ." The State's Attorney explained "the hospital doesn't give our office that information so I am unable to confirm it." The judge said: "Fine. It is all on the record. Let's go." The trial proceeded.

The second day of the trial, Wiggins was brought into the courtroom before the jury was seated. But the guards, dressed in their rubber gloves, took their position immediately behind Wiggins. There was another conference at the bench. Defense counsel said:

Your Honor, at yesterday's proceeding I objected to the procedure of the deputies bringing the defendant in wearing gloves. Today we have eliminated that to a certain extent in that the defendant was brought in prior to the jury being brought in. However, the deputies are still wearing gloves.

I would object to the procedure of the deputies wearing gloves in the courtroom seated behind the defendant as a

result of any inferences that they may draw concerning him and any thoughts that they may have in that regard.

I would alert the Court that I have reviewed some of the law, and I believe that it may be a basis for a motion for a mistrial, which I would make at this time, if the Court does not direct that the deputies after they have brought him in do not remove their gloves to avoid any adverse effects on the defendant's rights.

The judge was adamant:

I have no intention of ever removing their gloves, and, therefore, your motion for a mistrial is denied.

At a motion for a new trial tendered after the verdicts were entered, defense counsel brought up the matter again. After discussing other reasons requiring a new trial, he said:

Additionally, I think if you couple with that the matter of Mr. Wiggins being paraded back and forth in front of the jury with the deputies wearing gloves, I believe that procedure in and of itself was so inherently prejudicial as to deprive him of a fair trial in this case. That coupled with the co-defendant testimony was that resulted in a conviction in this particular case. For those reasons, I believe that Mr. Wiggins is entitled to a new trial.

The judge simply said: "All right. That's denied."

■ The Court of Special Appeals concluded that the trial judge erred in his denial of the objection to the wearing of rubber gloves by the guards in the presence of the jury. *Wiggins v. State,* 76 Md.App. 188, 198–199, 544 A.2d 8 (1988). The court reached that conclusion on the basis that the wearing of gloves was unnecessary for the well-being of the guards. It asserted: "The wearing of gloves by court-room security personnel is wholly inconsistent with the current theories concerning AIDS transmission." *Id.* at 198, 544 A.2d 8.[3] We agree that the trial judge erred, but

---

3. The Court of Special Appeals quoted from the *Surgeon General's Report on Acquired Immune Deficiency Syndrome* (October 1986);

we see no need at this time to enter the debate as to how AIDS is transmitted. We follow a different route than did the Court of Special Appeals in concluding that the judge erred.

■ The general rule, well settled in Maryland, is that "the conduct of a criminal trial is committed to the sound discretion of the trial judge...." *Hunt v. State,* 312 Md. 494, 506, 540 A.2d 1125 (1988). *Accord, Ricks v. State,* 312 Md. 11, 31, 537 A.2d 612, *cert. denied,* ── U.S. ──, 109 S.Ct. 90, 102 L.Ed.2d 66 (1988); *Smith v. State,* 299 Md. 158, 179, 472 A.2d 988 (1984); *Crawford v. State,* 285 Md. 431, 451, 404 A.2d 244 (1979), and cases therein cited. The discretion of a trial court in the overall direction of the trial ranges far but it is not infinite. Its reach stops when it is abused, and then the reviewing court will disturb it, as the cases above cited make clear. Even though the trial judge " 'runs the court,' the right of an accused to a fair trial, although not a perfect trial is paramount." *Crawford v. State,* 285 Md. at 451, 404 A.2d 244. The Supreme Court said in *Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976):

> The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment.... The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice. Long ago this Court stated:
>
> > "The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin*

from the Executive Summary to the *Report of the Governor's Task Force on Acquired Immune Deficiency Syndrome* (December 1986); and from *In Re Peacock,* 59 B.R. 568 (Bkrtcy.S.D.Fla.1986), which quoted an opinion of a medical epidemiologist with the Center for Disease Control. *See also* Sloan, *AIDS LAW: Implications for the Individual and Society* (1988); *AIDS: The Legal Issues* (ABA AIDS Coordinating Comm. Discussion Draft (1988)); Dalton, Burris, and the Yale AIDS Law Project, *AIDS and the Law: A Guide for the Public* (1987).

*v. United States*, 156 U.S. 432, 453 [15 S.Ct. 394, 402, 39 L.Ed. 481] (1895).

To implement the presumption, courts must be alert to factors that may undermine the fairness of the fact-finding process. In the administration of criminal justice, courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt.

425 U.S. at 503, 96 S.Ct. at 1692 (citations omitted). If the exercise of discretion results in the denial of a fair trial to a defendant, the discretion is certainly abused.

When the trial judge here in the exercise of his discretion authorized the guards to wear gloves, he did not "really know because nobody knows" whether Wiggins had AIDS. The judge acted on an unidentified source of information that there was "a strong possibility or probability" that Wiggins had the disease. As far as the record shows, the judge made no effort to ascertain the true status of Wiggins' health except to ask the State's Attorney. When the State's Attorney said that he did not know, the judge was satisfied. It seems that the judge proceeded on the assumption that since Haug had AIDS and since Gough carried the virus, Wiggins either had the disease or carried the virus. We believe that this was not enough to justify the judge's action. It was at the least premature. Without sufficient justification and over Wiggins' persistent and vehement protests, the judge forced Wiggins into a compromising position before those who were to decide his fate. In the circumstances the judge abused his discretion.[4]

---

4. There have been a number of cases before us concerning the discretion of the trial judge in ordering that the defendant be shackled and sometimes gagged in the presence of the jury during the course of the trial. We have not disturbed the exercise of discretion when it was clear from the record that there were good and sufficient reasons to support the judge's action. *See Bowers v. State*, 306 Md. 120, 123–139, 507 A.2d 1072, *cert. denied*, 479 U.S. 890, 107 S.Ct. 292, 93 L.Ed.2d 265 (1986), and cases therein cited; *Dixon v. State*, 27 Md. App. 443, 450–452, 340 A.2d 396, *cert. denied*, 276 Md. 741 (1975).

 The question is whether the error tainted the trial. The Court of Special Appeals was "not persuaded that the trial judge's cautious actions require reversal." 76 Md.App. at 199, 544 A.2d 8. It pointed out that the inferences claimed by Wiggins—that he had AIDS or the HIV virus, that he was a homosexual, and that he was an intravenous drug user—were in fact prejudicial was "not supported by any evidence in the record." *Id.* The court observed that during the voir dire there was no response from the jury when the judge informed the jury that "[t]his case has touches of homosexuality in it," and asked:

'Would that prejudice any member of the jury so that they could not fairly and impartially decide the case based solely on the evidence they are going to hear in this courtroom? If that applies to anybody, come up and tell me about it here.'

*Id.* The intermediate court also noted that there was evidence adduced that Wiggins and Haug went to the apartment to have sexual relations and that Wiggins, Cooper, Jennifer, and Gough were drug users. *Id.* at 199–200, 544 A.2d 8. The court concluded that the error was harmless. *Id.* at 200, 544 A.2d 8.

We do not agree. The rationale of the intermediate appellate court's conclusion skirts the issue. The reason the trial court authorized the wearing of gloves by the guards was not because Wiggins was a homosexual or a drug addict. The reason was the possibility that he had AIDS or was infected with the virus. It would be too much to assume that the jury's curiosity was not aroused upon seeing the guards wearing rubber gloves in this particular case and that the members of the jury were so unsophisticated that they did not know of the existence of AIDS and the dire consequences of the disease. This is not to say, however, that a representative juror would be aware of the opinions of the experts and the results of the studies by

We noted in *Bowers* that we preferred that the bases for the judge's action be explicitly stated. 306 Md. at 138, 507 A.2d 1072.

various committees and task forces which promoted the view that AIDS is not passed by casual, nonsexual contact. *See* note 2, *supra.* Or, indeed, if the juror was aware of that view that he subscribed to it. Despite the experts and the studies, a climate of fear still surrounds the disease.

An editorial on AIDS appeared in The Capital, a daily newspaper published in Annapolis, Maryland, under date of 17 February 1989. It noted that there had been 51 victims of AIDS, "a disease with no cure," in Anne Arundel County. The most recent victim was a baby whose mother passed along the virus. *Id.,* p. A10. Statewide, the editorial declared, almost 1,500 people have died from the disease.

Although most people have progressed beyond the days when creating AIDS leper colonies was seriously discussed, a panicked public is uncertain about how tough laws should be on HIV virus patients.

The public doesn't know whether to trust AIDS activists who say laws that crack down too hard on AIDS patients will drive them underground, spreading the disease faster.

*Id.* The editorial called for legislation which "balanc[ed] individual rights with the health, safety and welfare of society." *Id.*

The Baltimore Sun of 17 February 1989, § D, pp. 1–2, under the by-line of Jonathan Bor, reported that two beauty salons agreed to serve clients with AIDS virus only after a two-year battle engaged in by the Maryland Human Relations Commission. The woman involved, according to the paper, said that the ruling "may not change attitudes toward the disease but will at least give infected individuals some legal ammunition if they are faced with discrimination." *Id.*

The attitude of the general public is usually recognized by its representatives in the General Assembly. The feelings of the general public regarding AIDS is reflected in the array of bills—28 as of 16 February 1989, that have been filed with both houses of the Maryland legislature

"aimed at preventing the spread of AIDS and protecting people at risk of contracting the disease through their jobs." The Baltimore Sun, § F, pp. 1 and 5, 16 February 1989 by Jonathan Bor. At a public hearing on the bills, AIDS patients recounted their difficulties finding doctors to treat them. "With anger and tears, a bevy of corrections officers [at the same hearing] urged state lawmakers" to approve effective legislation that would require inmates to be tested for antibodies for AIDS virus in certain situations. *Id.* A Maryland Correction Commissioner cited "a recent study by the Johns Hopkins Medical Institutions showing that about 7 percent of inmates at the Maryland Penitentiary are infected with the human immunodeficiency virus (HIV), which causes AIDS. Some 70 percent of the state's inmates, he said, have histories of drug use—and most of them injected drugs intravenously, an activity that places them at high risk for HIV infection." *Id.*

Legislation is being sought to require that school children be instructed concerning prevention against AIDS. District of Columbia public health officials plan an AIDS educational campaign that features posters, one of which declaims: "AIDS. IT CAN HAPPEN TO ANYBODY." The Washington Post of 22 February 1989, § B, pp. 1 and 8. The news media has given extensive national coverage about the movie star who died from AIDS. His lover sued his estate claiming that "the late actor had concealed that he was suffering from the deadly disease." The Washington Post of 20 February 1989, § D, pp. 1 and 11 in an article entitled "AIDS ANXIETY: The Message in the Hudson Verdict," by Carla Hall. The jury awarded $21.75 million in compensatory and punitive damages. Ms. Hall observed that "[l]egal observers speculated that it was a measure of the public fear of AIDS" that the jury awarded a sum of that magnitude. A West Coast attorney who had litigated cases involving sexually transmitted diseases was quoted as "astounded." He thought "the magnitude could be seen as demonstrating how much the jury empathized with [the lover's] anxiety about getting AIDS." *Id.* See the "Stay-

ing Ahead" column in The Baltimore Sun of 20 February 1989, § C, p. 19 by Jane Bryant Quinn. The column noted: "AIDS, or the fear of it, may raise the price you pay for life insurance. The industry's dread of this disease is touching people with other kinds of illnesses." *See also* the article in The Baltimore Sunday Sun of 19 February 1989, § F, pp. 1 and 6, by Gail Caldwell of the Boston Globe, headed "Taking on Taboos." The article discusses a book by Susan Sontag entitled "AIDS and its Metaphors," the premise of which is "to demystify and destigmatize" the illness, without minimizing its horrific effects. *Id.* All of the above gives clear indication that in the public mind AIDS has yet to be demystified or destigmatized. AIDS prevails in a climate of fear.

We believe that the jury, viewing the officers guarding Wiggins, would not be without curiosity as to the guards' protective attire. We think that it is not improbable that the jury would assume, in light of the widespread and continuous publicity devoted to AIDS, that Wiggins was infected with the disease. We are of the opinion that the wearing of the gloves, without a sound basis shown for doing so, undermined the fairness of the fact-finding process and diluted the principle that guilt is to be established by probative evidence beyond a reasonable doubt. The witnesses to the events leading to the murder and the murder itself were by no means exemplary citizens. They were active participants in the crimes but had struck a plea bargain. Their background was the same as that of Wiggins—sexual deviants and drug abusers. We are not persuaded beyond a reasonable doubt that the wearing of gloves by the guards, which placed before the jury an unexplained factor irrelevant and extraneous to the issue of Wiggins' guilt or innocence, did not contribute to the guilty verdicts. For the error here to be harmless we must be satisfied that there is *no reasonable possibility* that it may have contributed to the rendition of the guilty verdicts. *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976). We are not so satisfied in the circumstances here. It is not a

big step in logical inference, considering the contemporary climate, from seeing the guards protected in their contact with the defendant to the thought that he might have AIDS. The error was not cured by the voir dire question. It is a far cry from not being prejudiced because the case "has touches of homosexuality in it," and not being prejudiced because the defendant may have AIDS. Inquiry with respect to the latter was not made. The reason why the guards wore gloves in this particular case was left to the speculation of the jury. Regardless of the credence the jury gave the testimony of the witnesses, or how it weighed the evidence, it is not far-fetched that the jury, observing the gloves, thought it better, in any event, that Wiggins be withdrawn from public circulation and confined in an institution with others of his ilk.[5]

## III

Wiggins also claims he is entitled to a new trial because he was denied his right against unreasonable searches and seizures guaranteed him by the Fourth and Fourteenth Amendments to the Constitution of the United States.

After Wiggins, Gough, Cooper, and Jennifer left the body of Haug on the lot, they went to Haug's apartment and ransacked it. They took the stolen articles to the apartment shared by Wiggins, Gough, and Cooper. The morning after

---

5. If the record showed that the trial judge obtained a fair medical opinion that Wiggins in fact had AIDS or carried the virus, the next step would be for the judge to ascertain and place in the record the prevailing expert view whether the gloves were necessary for the well-being of the guards. The reviewing court would then be able to pass on the propriety of the judge's discretion in the light of an adequate record.

Here, as we have seen, not only did the judge not know whether Wiggins had AIDS or was infected with the virus, but the record does not disclose whether the judge was aware of the prevailing expert view as to how the disease was transmitted and took action after giving it due consideration. The judge proceeded on the mere conjecture that Wiggins was infected, and the unsupported assumption that the disease could be transmitted by casual contact even with inanimate objects.

the murder, Haug's employer telephoned the maintenance supervisor of the complex in which Haug's apartment was located. The employer informed the supervisor that Haug had not shown up for work. As this was highly unusual, the supervisor was requested to check Haug's apartment. Haug was not in the apartment, but the supervisor observed that it was uncharacteristically out of order—in "complete disarray." The police were notified. Haug's body was found that same morning. Corporal Paul Noblitt of the Prince George's County Police Department was assigned to the case as the lead investigator.

The next day, an officer of the District of Columbia Metropolitan Police Department arrested Jennifer while he was driving Haug's car. On the basis of information obtained from Jennifer, the District of Columbia officers obtained a search warrant for the Wiggins–Gough–Cooper apartment. Under the authority of the warrant, the police entered the apartment, searched it, and seized certain articles. Wiggins filed a motion to suppress the tangible evidence seized. The motion was heard and denied. We recount the evidence adduced on the issue at the hearing.[6]

Noblitt testified that he and members of the Prince George's Police Department and the District of Columbia Metropolitan Police Department went to the Wiggins–Gough–Cooper apartment armed with the search warrant. The warrant was admitted in evidence. The State asked Noblitt to "[t]ell us what property, if any was seized as a result of the execution of that search warrant, and where it was located?" He replied:

---

6. Wiggins, Gough, and Cooper were joined for the suppression hearing. The greater part of the hearing was devoted to motions to suppress statements obtained by the police. The part of the hearing which dealt with the suppression of· the tangible 'evidence was brief. Its emphasis was on probable cause for the issuance of the warrant, an issue not now challenged.

 Wiggins was tried alone on the merits. Under their plea bargain agreements, Gough and Cooper pled guilty to certain charges and testified on behalf of the State at Wiggins' trial.

Numerous items of property, sir. Various items in each of the defendant's bedrooms. Property of Bjorn Haug.

The State had "no other questions at this time." On cross-examination it was elicited that "[t]he items were actually seized by the Metropolitan Police Mobile Crimes." Noblitt said:

I went through each and every room with those two [District of Columbia] officers, and identified various items we were looking for.

Noblitt indicated that "certain property" described by Jennifer as stolen from Haug was set out in the search warrant. In response to questions by Wiggins' defense counsel, Noblitt said that more items were seized "than were listed in the actual search warrant itself ..." and that he believed that he could recall where each specific item was located in the apartment. At this point, defense counsel withdrew the question and declared that he had no further questions. The State did not pursue the matter.

Cooper's defense counsel on cross-examination of Noblitt brought out that the police were also looking for a safe. Information that a safe had also been stolen was obtained while the warrant was being written and was not included in the warrant. The police went through each room of the apartment. In Cooper's room they seized a pair of tan construction boots and a green military flashlight, neither of which were listed in the warrant. They also seized a "black bag" from a closet in her room. Noblitt did not recall whether the bag was open or closed but it was later opened by one of the officers. The bag contained tapes and a coin collection, "a proof set, american coins." There was no indication on the coin set to whom they belonged. Also taken from Cooper's room were a Sony cassette tape player and a wallet containing United States currency but no identification, and a silver pocket watch.

Gough's attorney elicited that "stereo equipment ... watches, telephones, [and] some unopened champagne bot-

tles" were found and seized in Gough's room. The officer did not recall what else was seized from that room.

The State's Attorney told the court: "[T]hat is all I have today, pertaining to the search warrant." Defense counsel had no witnesses on the matter. In argument defense counsel were of a mind that only items named in the warrant or, if not named, if they were in plain view, could be seized. Gough's attorney also questioned the reliability of Jennifer's statement which served as the basis for probable cause. The State did not present an argument. The court denied the motion to suppress the tangible evidence.[7] It did not give reasons for the decision.

The State appended to its brief a copy of the search warrant. As best we can decipher the warrant, it authorizes the search of the Wiggins–Gough–Cooper apartment, and the seizure of the following property:

> stereo equipment consisting of a [dual] Cassette Player, Reel-to-reel Tape Player, Amplifier, Turntable, Cordless Phone and a Gray Nylon Bag with two handles and a zipper.

The return reporting the property seized upon execution of the warrant listed, as best we can make out:

> Tennis Shoes, Proof Set Coins, Military flashlights, (3) watches, [?] stamp, Ashtray, ring, Brass viking ship, Telephones, Stamp collection, Electric shaver, PLP, Lockset, Safe and personal papers of victim in PG Homicide, canvas bag (Gray) as described in Warrant, polaroid camera, Coin Set, stereo, Roma champagne, tan construction

---

7. At the time the case at hand was decided, Maryland Rule 4–252(g)(2) provided, *inter alia:*

> If the court denies a motion to suppress evidence, the ruling is binding at the trial unless the court, in the exercise of its discretion, grants a hearing de novo on a renewal of the motion. A pretrial ruling denying the motion to suppress is reviewable on a motion for a new trial or an appeal of a conviction.

*See Buie v. State,* 314 Md. 151, 155 n. 3, 550 A.2d 79 (1988).

In the case at hand, there was no renewal of the motion.

Maryland Rule 4–252(g)(2) was amended effective 21 December 1988. *See* note 12, *infra.*

boots, cassette tapes, Sony Portable Tape Deck and radio, blk wallet $120 currency, section of mattress Bloodstained, Grey Boots.

At the guilt stage of the trial, the State did not limit the items to go before the jury to those authorized to be seized by the warrant. The following articles, seized in the apartment, were admitted in evidence at the instance of the State:

a safe; a stamp collection; a Norelco razor; a Citizens watch, two bottles of Roma California champagne; a copper viking ship; two flashlights; an ashtray; two silver coin proof sets; a wine rack (introduced by way of a photograph); a Polaroid camera; two telephones.

The items involved may be grouped into three classifications:

1) the items listed in the warrant;
2) the items seized in the apartment; and
3) the items admitted into evidence.

We are, of course, interested only in the reasonableness of the seizure of those items which found their way into evidence. Of those items, only one, a telephone, could be an article listed in the warrant. But two telephones were admitted and only one was authorized to be seized by the warrant. The record does not disclose whether either of the telephones admitted was the "cordless phone" listed in the warrant.

 Those articles seized without the authority of the warrant and admitted in evidence may be divided into two categories: 1) those whose location in the apartment is revealed in the record; and 2) those whose location in the apartment is not disclosed by the record.[8] In the first

---

8. "In determining whether the denial of a motion to suppress ... is correct, the appellate court looks to the record of the suppression hearing, and does not consider the record of the trial itself." *Trusty v. State,* 308 Md. 658, 670, 521 A.2d 749, 755 (1987) [citation omitted; ellipsis in original].
*Buie v. State,* 314 Md. 151, 155 n. 2, 550 A.2d 79 (1988).

category are the coins found in Cooper's bedroom in a black bag in a closet,[9] and a flashlight. In Gough's bedroom the articles seized which were apparently among those admitted in evidence were telephones, bottles of champagne and possibly the Citizens watch. Exactly where in the bedrooms the articles were found (except for the coins) was not brought out. Where in the apartment the rest of the articles seized and admitted were found cannot be ascertained from the record.

It is well settled that the Fourth Amendment's "requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another." *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927). The rule is tempered, however, by the plain view doctrine, whether it be deemed an exception to the warrant requirement, *Washington v. Chrisman*, 455 U.S. 1, 5, 102 S.Ct. 812, 815, 70 L.Ed.2d 778 (1982), or simply "an extension of whatever the prior justification for an officer's 'access to an object' may be." *Texas v. Brown*, 460 U.S. 730, 738–739, 103 S.Ct. 1535, 1541–42, 75 L.Ed.2d 502 (1983). The plain view doctrine "permits a law enforcement officer to seize what clearly is incriminating evidence or contraband when it is discovered in a place where the officer has a right to be." *Chrisman*, 455 U.S. at 5–6, 102 S.Ct. at 815–16. *See Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29

---

In the case before us, our independent constitutional appraisal of the propriety of the trial judge's denial of the motion to suppress, *see Trusty v. State*, 308 Md. 658, 662 n. 3, 521 A.2d 749 (1987), is drastically hindered by the woeful inadequacy of the record of the hearing on the motion. A thorough winnowing of the transcript of the hearing produces mainly chaff and very little seed.

9. Under the color of the warrant, the police could search each room of the apartment and all places and things within the rooms which would accommodate an article listed in the warrant. Thus, for example, the officers in their search could open a closet, and if the closet contained a bag large enough to hold a telephone, they could search the bag.

L.Ed.2d 564 (1971). *Cf. Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987). The plain view doctrine requires that the State prove

> (1) the police had prior valid justification for the intrusion;
> (2) the circumstances show that the evidence seized was found inadvertently and in plain view;
> (3) the police were immediately aware of its significance.

*State v. Wilson*, 279 Md. 189, 194–195, 367 A.2d 1223 (1977). Wiggins looks to the particularity requirement of the Fourth Amendment in arguing his plea for a new trial. The State counters with the plain view doctrine.

■ The first prong of the doctrine is satisfied by the valid search warrant. It provided the police with the necessary prior valid justification for the intrusion. With respect to those articles not listed in the warrant whose whereabouts in the apartment were not revealed at the hearing on the motion, the second prong is not satisfied. If we do not know where they were found, we cannot determine whether they were found inadvertently and in plain view. With respect to those articles not listed in the warrant as to which there is some evidence as to their location in the apartment (although except for the coins, with little specificity) the third prong is left hanging. There is nothing to show, except for the safe and perhaps a telephone, that when the police seized the articles the officers were immediately aware of the articles' significance.[10] The articles seized were not contraband. They were innocent on their face and would be "evidence" only if the police were aware at the time they were seized that they had been stolen from Haug. The officer's flat statement, standing naked without any supporting data, that they were "[p]roperty of Haug"

---

10. The safe was known to have been stolen from Haug, but was not listed in the warrant. The record does not disclose where in the apartment it was found. Telephones were found someplace in Gough's bedroom. A cordless phone was listed in the warrant but, as we have noted, we cannot tell whether it was one of the telephones seized. *See supra* at 249–250.

was certainly inadequate. It appears that the only source relied on by the police as to what had been taken from Haug's apartment was Jennifer. The police enumerated in the warrant the articles Jennifer told them had been stolen (except for the safe which they learned about from Jennifer too late to include in the warrant). A copy of Jennifer's statement to the police was not presented to us. We cannot glean from the record that, except for the safe and perhaps a telephone, the police knew that the articles they seized had been stolen, or that the police had facts available such as would " 'warrant a man of reasonable caution in the belief' " that they were stolen. *Texas v. Brown,* 460 U.S. at 742, 103 S.Ct. at 1543, quoting *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925). The third prong of the doctrine was not satisfied. In short, the seizures were not rendered reasonable by application of the plain view doctrine [11] and they were not otherwise shown to be reasonable. We hold that the trial judge, on the evidence before him, erred in denying the motion to suppress.

 The Court of Special Appeals brushed over the error of the trial judge in denying the motion to suppress by concluding that it was harmless. The intermediate court explained:

> In view of the fact that the State did introduce evidence legitimately seized pursuant to the warrant, and in light of the testimony of appellant's accomplices Cooper and Gough, we conclude that there is 'no reasonable possibility that the decision of the finder of fact would have been different had the tainted evidence been excluded.'

*Wiggins,* 76 Md.App. at 195, 544 A.2d 8. As we have seen, it is not at all clear that the State introduced *any* evidence

---

**11.** The Court of Special Appeals observed that the State failed to present any evidence to satisfy its burden of proof regarding either inadvertence or plain view, and based on our review of the record, the State did not even make any real effort to obtain evidence for such support.
*Wiggins v. State,* 76 Md.App. 183, 194, 544 A.2d 8 (1988).

that was constitutionally seized under the warrant and even if it did, it was meager at best. We do not subscribe to the State's notion that "the evidence *not* subject to the search warrant was merely cumulative of that evidence which *was* seized under the warrant. . . ." (Emphasis in original.) It is true that there was also tangible evidence introduced by the State which was not seized in the apartment. This included photographs of pipes found at the murder scene and of Haug's automobile, a 1983 Honda Prelude. Also admitted were a small portable radio recovered from the Prelude and identified as Haug's, and grey work gloves found near a dumpster at the scene of the murder which Cooper identified as having been worn by Wiggins on the night of the murder. Wiggins does not here challenge the introduction of any of this evidence. Yet even in the light of such evidence as was properly admitted, there is no way, as we see it, that the array of evidence which was improperly paraded before the jury could be deemed to be harmless error under the test we enunciated in *Dorsey v. State,* 276 Md. at 659, 350 A.2d 665.

## IV

We have held that, under the circumstances, the trial judge erred in overruling Wiggins' objection to the wearing of rubber gloves by the guards and that the error was not harmless. We have further held that, in the circumstances, the trial judge erred in denying Wiggins' motion to suppress the tangible evidence and that the error was not harmless. The bottom line is that Wiggins is entitled to a new trial.[12]

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED;

CASE REMANDED TO THAT COURT WITH DIRECTION TO REMAND TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR A NEW TRIAL;

---

12. *See* Maryland Rule 4–252(g)(2) as amended to take effect 21 December 1988. *See also Logue v. State,* 282 Md. 625, 626–628, 386 A.2d 780 (1978).

**254**

COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PRINCE GEORGE'S COUNTY.

ELDRIDGE, J., concurs in the result only.