602 A.2d 212

**Bernard WIGGINS**

v.

**STATE of Maryland.**

**No. 211, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

March 2, 1992.

554

José Felipé Anderson, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Alexander Williams, Jr., State's Atty. for Prince George's County of Upper Marlboro, on the brief), for appellee.

Argued before ALPERT, BLOOM and WENNER, JJ.

ALPERT, Judge.

Armed with a search and seizure warrant, police officers conducted a search of an apartment that appellant, Bernard Wiggins, shared with two other persons. The introduction into evidence, at the trial of appellant for murder and other offenses, of various items that were not listed in the warrant and were not satisfactorily shown to have been properly seized under the "plain view" doctrine was one of two bases for reversal of appellant's convictions for first degree felony murder, robbery with a deadly weapon, and theft.

*Wiggins v. State,* 315 Md. 232, 554 A.2d 356 (1989).[1] At appellant's retrial, the State introduced into evidence many of those same items, demonstrating that they were properly seized under the "plain view" doctrine, thus avoiding the pitfalls of the first trial. Appealing his convictions for felony murder, robbery, and theft,[2] he argues that the trial court erred

1. In denying appellant's motion to suppress items not listed in the original search warrant.

2. When it limited appellant's cross-examination of a key State's witness.

3. When it prevented appellant's questioning a key State investigator about the absence of appellant's fingerprints on the victim's vehicle.

Perceiving no reversible error, we shall affirm.

## FACTS

Juan Demitrus Gough and Jacquelyn Cooper, who were charged, along with appellant, with the robbery, kidnapping, and murder of the victim and burglary of his apartment, entered into plea agreements with the State, which required them to testify against appellant. The following facts preceding the discovery of the victim's body are derived from their testimony.

Appellant, a homosexual, Gough, a homosexual, and Cooper, a lesbian, lived together in an apartment in the District of Columbia. In a pub, on the night of the murder, Bjorn

---

1. This Court had affirmed the convictions despite the error in admitting the seized objects into evidence, holding that the error was harmless. *Wiggins v. State,* 76 Md.App. 188, 544 A.2d 8 (1988). The Court of Appeals disagreed with our harmless error conclusion. On that basis, and for error in overruling an objection to the wearing of rubber gloves by officers guarding appellant in the courtroom, the Court of Appeals reversed our judgment and remanded the case to us with direction to remand to the circuit court for a new trial.

2. Appellant was also convicted of kidnapping but not sentenced for that offense, which was treated as the underlying felony for the first degree murder conviction.

Haug solicited Cooper, thinking she was a male. She suggested that he meet appellant. Haug went with Cooper and appellant to their apartment. Gough and his lover, Erik Jennifer, were there. Appellant and Haug went into appellant's bedroom. Appellant came out of his bedroom, and announced to his friends that he intended to "knock out" Haug, "take him and leave him somewhere, and take his car and credit cards." After appellant returned to his room, there was a loud crash, and Gough saw Haug in the bedroom "knocked out" and "bloody." Gough, Jennifer, and Cooper carried Haug, wrapped in a sheet, to his car and put him in the trunk. After driving around for a time in the victim's car, with appellant at the wheel, they heard thumping from the trunk. Appellant pulled over to a vacant lot in Prince George's County and "popped" the trunk. Haug got out of the trunk. At appellant's urging, Gough and Cooper beat Haug with sticks, but did not succeed in knocking him out. They returned to the car. Gough saw appellant "swing down" at Haug. Leaving Haug lying on the ground, appellant, Gough, Cooper, and Jennifer went to Haug's apartment and removed several items. Subsequently, Haug was found on the lot, with a length of pipe embedded in his face. He was dead.

After appellant, Gough, Cooper, and Jennifer left the body of Haug on the lot and went to Haug's apartment and ransacked it, they took the stolen articles to the apartment shared by appellant, Gough, and Cooper. The morning after the murder, Haug's employer telephoned the maintenance supervisor of the complex in which Haug's apartment was located. Haug had not shown up for work, which was highly unusual, and the maintenance supervisor was requested to check Haug's apartment. Haug's apartment was uncharacteristically out of order, and the police were notified. Detective Paul Noblitt was assigned to the case as lead investigator. The next day, an officer of the District of Columbia Metropolitan Police Department spotted Jennifer driving Haug's car and arrested him. On the basis of information obtained from Jennifer, the District of Co-

lumbia officers obtained a search warrant for the apartment occupied by appellant, Gough, and Cooper, on the authority of which they entered the apartment, searched it, and seized certain articles. Appellant's motion to suppress the evidence was denied.

After the case was remanded to it pursuant to the mandate of the Court of Appeals, the circuit court conducted a new, and much more thorough, evidentiary hearing on the suppression motion.

## I.

Appellant first contends that the Court of Appeals' reversal of appellant's first conviction, in part because of the trial court's erroneous denial of appellant's pre-trial motion to suppress the same evidence he now challenges, operated as "law of the case" with respect to this issue, and therefore the issue should not have been relitigated at appellant's second trial.[3]

We believe that issue was waived by appellant. He never argued, either at the second suppression hearing or the trial that followed it, that the evidence should be suppressed because the Court of Appeals had already ruled on that issue. The only mention made of the Court of Appeals decision was at the suppression hearing when appellant cited that Court's opinion in *Wiggins* as authority for the proposition that an officer has no right to seize items not listed in the search warrant absent a belief that the items are fruits of a crime. Because the "law of the case"

---

3. "[L]aw of the case refers to the principle that issues once decided in a case that recur in later stages of the same case are not to be redetermined. Thus, just as notions of collateral estoppel prevent the relitigation of the same issues in successive suit, this doctrine limits relitigation in successive stages of a single suit. For example, law of the case will apply when an issue in the case is decided by the trial court and appealed. If the appellate court reverses and rules on the law to be applied and how it affects certain issues of the case, those findings will be binding on the trial court when the action is remanded for a new trial." Friedenthal, Kane & Miller, *Civil Procedure*, (1985), at 611.

argument was not raised at the suppression hearing or at trial, it was not preserved for appellate review. Maryland Rule 8–131(a) provides that "[o]rdinarily, the appellate court will not decide any ... issue unless it plainly appears by the record to have been raised in or decided by the trial court...." This Rule is applicable to criminal as well as civil cases. *Manuel v. State*, 85 Md.App. 1, 22, 581 A.2d 1287 (1990); *Reed v. State*, 78 Md.App. 522, 536, 554 A.2d 420 (1989); *Davis v. State*, 189 Md. 269, 55 A.2d 702 (1947). Accordingly, we decline to entertain that argument.

## II.

Appellant further argues that Noblitt's reasons for seizing the items not listed in the warrant were insufficient to support the conclusion that any of the items seized from the apartment were clearly incriminating evidence or contraband, as required to invoke the "plain view" doctrine. Appellant objected when the items were admitted into evidence, citing the Fourth Amendment, referring to Noblitt's lack of personal knowledge, and asserting that Noblitt was merely speculating that the items had been taken from Haug's apartment. That issue was clearly preserved for our review.

The suppression hearing judge announced his ruling as follows:

All right. I find by a preponderance of the evidence that this search and seizure of certain items were properly done because, number one, that the police had prior valid justification for the intrusion in Mr. Wiggins' apartment. Secondly, I find that based on the testimony I have heard, that the circumstances show that all of the items seized by Officer Noblitt, that the State intends to introduce into evidence, and has been testified to by Officer Noblitt, were found inadvertently and in plain view. And lastly, I find that Officer Noblitt acted reasonably in his conduct of the execution of the search warrant in this case, and that he was immediately aware of the significance of

these items, and believed them to be the fruits of the crime. Accordingly, the motion to suppress is denied.

## STANDARD OF REVIEW

"In determining whether the denial of a motion to suppress ... is correct, the appellate court looks to the record of the suppression hearing, and does not consider the record of the trial itself." *Trusty v. State,* 308 Md. 658, 521 A.2d 749 (1987), quoting *Jackson v. State,* 52 Md.App. 327, 332 n. 5, 449 A.2d 438, *cert. denied,* 294 Md. 652 (1982).

In considering the evidence, we give great deference to the fact-finding of the trial judge with respect to determining credibility of the witnesses, and weighing and determining first-level facts. *Perkins v. State,* 83 Md.App. 341, 346, 574 A.2d 356 (1990); Md.Rule 8–131(c). With respect to the ultimate, conclusive fact of whether a search or seizure was valid, however, we must make our own independent constitutional appraisal by reviewing the law and applying it to the facts. *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990). Thus, the issue before us is not whether the trial judge erred in his assessment of probable cause, but whether the police officer, at the time he first saw the items in question, had probable cause to seize those items.

In resolving that issue, we are constrained to consider the totality of the circumstances as they appeared to the seizing officer. *Malcolm v. State,* 314 Md. 221, 230, 550 A.2d 670 (1988). As we observed in *Parker v. State,* 66 Md.App. 1, 8, 502 A.2d 510 (1986):

'probable cause is not to be evaluated from a remote vantagepoint of a library, but rather from the viewpoint of a prudent and cautious police officer on the scene at the time of the arrest. The question to be answered is whether such an officer in the particular circumstances, conditioned by his observations and information, and guided by the whole of his police experience, reasonably

could have believed that [the items he seized were fruits of the crime].'

## PROBABLE CAUSE AND THE "PLAIN VIEW" DOCTRINE

It is well settled law that the Fourth Amendment's "requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another." *Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927).

The "plain view" doctrine is, however, often considered an exception to this general rule. It "permits a law enforcement officer to seize what clearly is incriminating evidence or contraband when it is discovered in a place where the officer has a right to be." *Washington v. Chrisman,* 455 U.S. 1, 5–6, 102 S.Ct. 812, 815–16, 70 L.Ed.2d 778 (1982).

The criteria that generally guide seizures under the "plain view" doctrine were set forth in *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), and very recently by the Supreme Court in *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990), which discussed the three limitations on the doctrine.[4] First, the officer must not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. Second, the item must be in plain view and its incriminating character must also be "immediately apparent." Third, the officer must not only be lawfully located in the place from which the object can

---

**4.** *Horton* eliminated the requirement that the discovery of evidence in plain view must be "inadvertent." For a recent Maryland decision discussing the three conditions to be satisfied for there to be a reasonable seizure under the "plain view" doctrine, *see Sanford v. State,* 87 Md.App. 23, 589 A.2d 74 (1991). *See also State v. Wilson,* 279 Md. 189, 367 A.2d 1223 (1977).

be plainly seen, but he or she must also have a lawful right of access to the object itself. *Id.* at 123.

Appellant's argument in the case *sub judice* focuses on the second requirement. He asserts that Noblitt's reasons for seizing the items not specified in the search warrant were based on his speculative "belief" that the items were incriminating in nature. Such speculation, he argues, is insufficient to meet the "immediately apparent" requirement.

■ This requirement, that the item's incriminating character must be "immediately apparent," is a corollary of the probable cause requirement. *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987). It requires that the facts available to the officer would "warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." A "practical, nontechnical" probability that incriminating evidence is involved is all that is required. *Texas v. Brown,* 460 U.S. 730, 742–43, 103 S.Ct. 1535, 1543–44, 75 L.Ed.2d 502 (1983), quoting *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925), and *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949). "The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." *Payton v. New York,* 445 U.S. 573, 587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980).

There is no requirement that the seizing officer be *certain* that the item seized is evidence of criminal activity. As the Supreme Court stated in *Brown,* 460 U.S. at 741, 103 S.Ct. at 1543:

Decisions by this Court since *Coolidge* indicate that the use of the phrase "immediately apparent" was very likely an unhappy choice of words since it can be taken to imply that an unduly high degree of certainty as to the incrimi-

natory character of evidence is necessary for an application of the "plain view" doctrine.

The issue in *Brown* was whether a balloon seized by the officer should have been suppressed because it could not have been "immediately apparent" to the police officer that the balloon was incriminating evidence. In view of the police officer's testimony that balloons are commonly used in packaging narcotics, he had probable cause to believe that the balloon contained an illicit substance. The Supreme Court further stated that its observation in *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), regarding "particularized suspicion," is equally applicable to the probable cause requirement. It stated:

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

*Brown*, 460 U.S. at 742, 103 S.Ct. at 1543, quoting *Cortez*, 449 U.S. at 418, 101 S.Ct. at 695.

■ It follows that the subjective belief in the officer's mind is critical, *DiPasquale v. State*, 43 Md.App. 574, 578, 406 A.2d 665 (1979), and while a *bona fide* belief on the part of the officer is never enough, standing alone, to justify a Fourth Amendment intrusion, we must still measure whether such a subjective belief was reasonable. *Id. See also Sanford v. State*, 87 Md.App. 23, 589 A.2d 74 (1991). The question then becomes, "Would a reasonably prudent officer, having the background, knowledge, and information possessed by the seizing officer in this case, reasonably believe that the object in plain view before him was evidence of crime or contraband?" In answering this question, we must bear in mind that there is a critical distinction between reasonable belief that an object is evidence or

contraband, and mere suspicion that it might be. Mere suspicion on the part of the police officer will not reach the level of probable cause. *Arizona v. Hicks, supra,* 107 S.Ct. at 1153. *See State v. Wilson,* 279 Md. 189, 197, 367 A.2d 1223 (1977).

We are mindful of the Court of Appeals opinion in *Wiggins v. State, supra,* and we have considered its findings with respect to probable cause to seize the items not suppressed at appellant's first trial. The Court divided those articles seized without authority of the warrant into two categories: those whose location in the apartment was revealed by the record, and those whose location in the apartment was not disclosed by the record. The Court found that for those items whose location was not disclosed by the record, it was unable to determine whether those items were found in plain view. With respect to those articles whose location was disclosed by the record, it was unable to determine whether it was "immediately apparent" to the officer that they were contraband, since they appeared to be innocent on their face.

In the case *sub judice,* the search warrant listed the following property as the objects of the search:

stereo equipment consisting of a [dual] cassette player, reel-to-reel tape player, amplifier, turntable, cordless phone and a gray nylon bag with two handles and a zipper

and the return reporting the property seized upon execution of the warrant listed:

tennis shoes, proof set coins, military flashlights, (3) watches, [?] stamp, ashtray, ring, brass viking ship, telephones, stamp collection, electric shaver, PLP, lock-set, safe and personal papers of victim in PG homicide, canvas bag (gray) as described in warrant, polaroid camera, coin set, stereo, Roma champagne, tan construction boots, cassette tapes, Sony portable tape deck and radio, black wallet $120.00 currency, section of mattress bloodstained, grey boots.

The following articles, seized in the apartment, were admitted in evidence in the case *sub judice* at the insistence of the State and over objection of appellant:

photograph of coins, photograph of Citizen watch and ashtray, safe, papers from inside the safe, stamp, stamp collection book, Roma champagne bottles, photographs of flashlights, two telephones, safe handle, watch box, photograph of Viking ship.

There was ample testimony at the suppression hearing as to where in the apartment the seized items were located. Appellant does not assert that the seized items were not in "plain view," *i.e.*, within the view of the officers while they were lawfully searching through the apartment for the items listed in the warrant. Therefore, we shall focus on whether there was probable cause to seize the items that were not listed in the search warrant.

Faced with the question of whether the facts available to Detective Noblitt, as testified to by him at the suppression hearing on remand, warranted in him the belief that those items seized were contraband or stolen property or useful as evidence of the crime in the case *sub judice*, we must first look to the detective's testimony. If necessary, we must then consider the nature of the exhibits themselves to determine whether, under all the circumstances, a reasonable person possessed of the officer's training, experience, and knowledge, would have reason to believe that those items were probably evidence or fruits of crime.

## DETECTIVE NOBLITT'S TESTIMONY—THE SEIZED ITEMS AS EVIDENCE OF CRIME

Noblitt testified at the suppression hearing that, before the execution of the search warrant, he had visited Haug's apartment and made certain observations. He had also interviewed Jennifer, who was involved in the crime and from whom he elicited information, and he had obtained additional information from a friend of the victim.

With reference to specific items not listed in the warrant but seized by him, Noblitt explained how he arrived at his conclusion that those items were fruits of the crime.

## The Coin Sets

■ During his visit to Haug's apartment, Detective Noblitt had observed that Haug was a coin collector, and it was apparent that some silver coin sets were missing from a display shelf in Haug's apartment. He found, in various places in appellant's apartment, silver coin sets of the same type that Haug collected. There being "no indication that Mr. Gough or Miss Cooper collected coins," Detective Noblitt seized the coin sets, believing them to have been stolen from Haug's apartment. Because of their distinctive character and considering the fact that Noblitt noticed some of the sets were missing from the victim's apartment, it is obvious that he had probable cause to believe that they were evidence or fruits of the crime.

## The Military Flashlights

■ Detective Noblitt seized some "military flashlights." He was aware that Haug was retired from the Air Force and had kept in his apartment military clothing and gear. He had seen a similar flashlight in Haug's apartment. Since "Mr. Wiggins didn't appear to be in the military or have a military connection," he believed that the military flashlights had been taken from Haug's apartment. It should be remembered that we are dealing with probabilities and not certainties. We can fairly state that, given all of Noblitt's knowledge gained from his investigation, when combined with the items otherwise seized, it was more likely so than not so that the flashlights belonged to the victim. *See Parker v. State, supra* [66 Md.App.] at 8, 502 A.2d 510.

## The Norwegian Postage Stamp

■ The detective saw, in Wiggins's bedroom, a Norwegian postage stamp and seized it because he knew the

victim was (1) Norwegian, and (2) a stamp collector. Because it was distinctive in character, out of place in appellant's bedroom, and obviously had a stronger connection to the victim than to the appellant, there was probable cause to seize it.

### The Second Telephone

After seizing the cordless telephone listed in the warrant, Noblitt seized another telephone because he saw the victim's telephone number on it. Noblitt was familiar with the telephone number because of a conversation he had with the victim's friend, Mr. Foster, and Mr. Foster's mother, Patricia Alford. Thus, there was probable cause to seize the second telephone.

### The Roma Champagne

Several bottles of Roma champagne were seized because, when Noblitt was at Haug's apartment, he had observed several bottles of that brand of champagne in racks, and all but one of the racks was empty. Again, given all of the information available to Noblitt, when considered along with his observation that all but one of the racks was empty, there was probable cause to seize the Roma champagne.

### The Safe

A friend of the victim had informed Noblitt that Haug had a safe. When Noblitt arrived at the victim's apartment, he observed, on the floor, safe insulation trailing out to the front door, a hammer, a long screwdriver, and other tools, indicating that someone had tried to pry open a safe. Also, Jennifer had indicated that a safe had been taken when he and the others burglarized the apartment. Personal papers were inside the safe. Given the fact that Noblitt was armed with knowledge that Haug had a safe, no safe was found in his apartment, there was evidence of entry into a safe, all suggesting that a safe had been

removed, it was more likely so than not so that the safe seized in Wiggins's room was evidence of the crime.

## The Bloodied Mattress Cover

The bloodied mattress cover was seized because Jennifer had indicated to Noblitt that the victim had been lying on a mattress when he was struck. Once more, we hold that viewing the totality of the circumstances, Noblitt had probable cause to seize that item. (The evidence is not clear as to whether this item was introduced into evidence at trial.)

## The Viking Ship

On a nightstand next to Wiggins's bed, Noblitt observed a Norwegian stamp, a Citizen watch (see *infra*), and a brass Viking ship. He testified that he knew, when he seized the Viking ship, that Haug had been born and had grown up in Norway. That knowledge was undisputed at the motions hearing. There was no dispute that the item seized was, indeed, a model of a Viking ship. Additionally, Noblitt testified that he knew, when he seized the Viking ship, that Haug collected Norwegian items, and nothing in Wiggins's apartment indicated that he was a collector. Although the quantity and quality of the probable cause to seize this item is not as substantial as determined with regard to the items hereinbefore mentioned, we are not dealing with certainty or belief beyond a reasonable doubt—but probability. Again, looking at the totality of the circumstances, we believe there was probable cause to seize the Viking ship. Assuming, *arguendo*, that the motions judge erred in admitting the Viking ship, we believe that error to be harmless beyond a reasonable doubt when considering all of the other evidence garnered in the investigation. *See Dorsey v. State*, 276 Md. 638, 350 A.2d 665 (1976).

## The Citizen Watch

Detective Noblitt had been told by Haug's friend that Haug had recently purchased a Citizen watch, gold in

color, with a "thin square face and a brown leather band."
So, when Detective Noblitt was in Wiggins's room and
observed the watch on the nightstand, along with the Nor-
wegian stamp and the Viking ship, he obviously made the
mental connection that it was the victim's watch. We do
not believe that to be unreasonable. Again, viewing the
totality of the circumstances, and particularly the location
of the watch in connection with other items believed to
belong to the victim, there was probable cause to seize that
watch.

### The Stamp Albums

Searching for items named in the warrant, Detec-
tive Noblitt had occasion to look under appellant's bed. The
following colloquy between the prosecuting attorney and
the detective presents a clear view as to why he had
probable cause to seize what he believed to be stamp
albums.

Q Why did you look under the bed?

A There appeared to be items under the bed.

Q All right. Now, of the items that were named in the
warrant to be seized, were those items that you believed
at the time could have been under the bed?

A That's a possibility. Yes, ma'am.

Q When you looked under the bed, what, if anything,
did you observe that you believed at the time of observa-
tion to be evidence in this case?

A Yes, ma'am. A large stamp collection book.

Q At the time that you observed the stamp collection
book, what led you to believe it would be evidence in this
case?

A Knowing that the victim was also a stamp collector.

Q The stamp collection book that you observed, can you
describe it for the Court, exactly what you observed when
you looked under the bed.

A It's a large blue looseleaf notebook type.

Q Were you just able to tell just by looking at it,
without moving it, that it was a stamp collection?

A Yes, ma'am.

Q How were you able to do so?

A It was about this thick (indicating), and one could see that there were envelopes in, apparently, plastic covers which would indicate a stamp collection.

Q Was there anything in the defendant's apartment to indicate that he was a stamp collector?

A No, ma'am.

Q Had you seen items in the victim's apartment that indicated that he was a stamp collector?

A Yes, ma'am, numerous stamp collections.

Q Did it appear, at the time that you observed the stamp collection book, that it was an expensive item?

A I couldn't tell from looking.

Q Did it strike you at all as unusual that a stamp collection would be under one's bed?

A Yes, ma'am.

Q Was that something that you considered upon seeing it that caused you to believe that it was evidence?

A Yes, ma'am.

There was more than mere suspicion or speculation on the part of Detective Noblitt; he saw what he believed to be an album in which a stamp collector would collect stamps. At the motions hearing, appellant's counsel did not argue that the albums did not or could not appear to be stamp albums, he merely contended that "there is no way that this information ... that the stamp envelopes that were found under the bed ... belonged to the decedent."

### The Copper Ashtray

We cannot tell from the record the basis for seizing the copper ashtray. It is obvious that its admission into evidence was error. It is likewise obvious that it does not tend to establish appellant's criminal agency and is, therefore, harmless beyond a reasonable doubt. *See Dorsey, supra.*

■ It appears from the record that photocopies of the exhibits were introduced at trial but not at the motions hearing. Upon examining the record, we are advised that

the Clerk's Office in the Circuit Court for Prince George's County disposed of all photocopies of the exhibits in this case. It is arguable that the absence of the photocopies would hamper our required independent assessment of probable cause. First, we note that the appellant did not raise this as an issue with regard to our appellate review and, therefore, it is not preserved. An issue not presented in the brief need not be considered by us. *Logan v. Town of Somerset*, 271 Md. 42, 67, 314 A.2d 436 (1974). Secondly, it may well be that we are prohibited from viewing the photographs since they were not introduced at the suppression hearing.

Although it would have been preferable for both the trial judge and this court to have viewed the subject photographs, we are convinced that their absence is not fatal to our probable cause determination.[5] When we view the allegedly insufficient descriptions of the watch and the stamp album against the solid background of Detective Noblitt's information and observations, a holding of probable cause is irresistible. As we observed in *Lomax v. State*, 16 Md.App. 502, 509, 298 A.2d 454, *cert. denied*, 268 Md. 750 (1973):

> Mathematical principles and propositions of pure logic maintain that the whole cannot exceed the sum of its individual parts. Yet in the law, whose life has not been logic but experience, a different result often obtains.

---

5. The Supreme Court of the United States, in *Hernandez v. New York,* —— U.S. ——, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), recognized that certain components of independent constitutional review by an appellate court represent findings of fact of the sort to be accorded great deference on appeal, *id.* 111 S.Ct. at 1868, and that "in the absence of exceptional circumstances, [the appellate court] would defer to [the trial court's] factual findings, even when those findings relate to a constitutional issue." *Id.* at 1870.

 The *Hernandez* court deferred to the trial court's credibility assessment of the prosecutor's reasons for exercising certain peremptory challenges. Here, the trial judge found that Detective Noblitt "was immediately aware of the significance of these items, and believed them to be the fruits of the crime." The trial judge believed what Noblitt told him.

Items of information or of evidence, when assembled in combination frequently can provide a basis for a judgment or decision which could not be reached by a court confined solely to compartmentalized, disparate consideration of those items.

That principle is clearly applicable to Detective Noblitt's consideration of probable cause to seize the subject items and applies with equal force to our review of his decision.

## III.

Appellant also asserts that the trial court erred in limiting his cross-examination of State's witness Jacquelyn Michelle Cooper. Apparently, Cooper made a plea bargain, which included a lesser sentence in exchange for her testimony against appellant.[6] The following occurred on direct examination:

[Prosecutor]: Now, did there come a time that you entered into a plea agreement with the State concerning this matter:

[Cooper]: Yes.

[Prosecutor]: And what were the terms of that plea agreement? Do you remember?

[Cooper]: I pleaded guilty to kidnapping, theft and burglary, and it was a 35 year cap. When I got sentenced, they couldn't give me no more than 35 years.

On cross-examination, the following occurred:

[Defense Counsel]: Did you have discussions with Lamasney concerning the potential sentences that you could receive for these various charges?

---

**6.** The trial judge cautioned the jury with regard to Cooper's testimony:

The last thing I want to tell you about their testimony is that they have pleaded guilty to the same thing or some of the things with which Mr. Wiggins is charged, and they have pleaded guilty as a result of what we call a plea agreement; that is, a promise was given by the State to them that certain things would be done if they would testify in this case. However, you are to consider such testimony with caution, because that testimony may have been colored by a desire to gain leniency by testifying against Mr. Wiggins.

[Cooper]: Yes.

[Defense Counsel]: Do you have a recollection as to what Miss Lamasney indicated to you concerning what the maximum sentence was for first degree murder?

[Prosecutor]: Objection.

[The Court]: Come up.

[The Court]: Tell me why you think that's admissible.

[Defense Counsel]: It's admissible to show a motivation to lie, the maximum sentence she was facing. It's not privileged information as to what the sentences were. The conversations that Miss Lamasney had with her are the sentences that she was advised of, and are not confidential.

The objection was overruled, and the witness answered that she was told she could be sentenced to life if she were convicted of first degree murder. Later, the following ensued:

[Defense Counsel]: Now, what was the actual sentence that you got?

[Cooper]: Twenty-five years.

[Defense Counsel]: Was that sentence ever reduced?

[Cooper]: It was reduced.

[Prosecutor]: Objection.

[The Court]: Come up.

[The Court]: Tell me why you think that's admissible.

[Defense Counsel]: Again, it goes to her motivation to testify.

[The Court]: The only thing that goes to motivation is what she was promised. She was promised a cap no more than 35 years. It doesn't make any difference what she got. The objection is sustained.

 Appellant argues that the trial judge, in limiting cross-examination of Cooper, precluded him from fully demonstrating her bias or prejudice. He asserts that the information regarding the extent of Cooper's sentence reduction could have impeached her credibility and provided a motive

for fabrication. Therefore, he urges, reversal is required. We disagree.

Recently, in *Smallwood v. State*, 320 Md. 300, 577 A.2d 356 (1990), the Court of Appeals discussed the issue of cross-examination of witnesses for matters affecting bias or prejudice. In that case the trial court prohibited questioning of a witness regarding the outcome of earlier charges wherein she had sworn out a warrant against the defendant. The defendant was attempting to prove that the witness had been unsuccessful in obtaining convictions of the defendant in previous cases and, thus, had a motivation for testifying as she did in that case. The court found error, and it found that error to be harmful.

Unfortunately for the appellant, we are not blessed with the degree of information possessed by the *Smallwood* court. We explain.

Appellant apparently knew about a sentence reduction Cooper had received because in his brief he stated "On cross-examination Appellant was forbidden to inquire about a sentence reduction she had received." As indicated earlier, Cooper knew that she was facing a maximum sentence of life imprisonment if convicted of first degree murder. Under her plea agreement, she faced a maximum sentence of 35 years. When asked the length of her "actual sentence," she responded, "25 years." Next, she was asked whether that sentence was ever reduced, and she responded that "It was reduced." That response could be interpreted in one of two ways: (1) that it had already been reduced from 35 years to 25 years or (2) that it was reduced from 25 years to a lesser term.

As the State posits, the sentence was reduced to 25 years, the trier of fact heard that testimony, and it was not stricken from the evidence. Assuming, *arguendo*, that a 25–year sentence had been reduced, there was no proffer of the extent of the sentence reduction. There is nothing whatever in the record of this second trial that would lead us to believe that appellant was unaware of the extent of

Cooper's sentence reduction. Indeed, the converse appears to be true. If a sentence of 25 years was substantially reduced, then it possibly could have had an effect on Cooper's credibility, although it would seem that a hypothetical reduction from life to 25 years would be sufficient for the trier of fact to form an opinion as to whether Cooper was coloring her testimony to "save her own skin." Trial counsel neither proffered that he did not know the extent of a reduction, or if he knew it, the number of years that the sentence was reduced. Without a proffer, we are unable to determine whether the trial judge's ruling prejudiced Wiggins's case. *See Grandison v. State,* 305 Md. 685, 742, 506 A.2d 580 (1986). It is noteworthy that defense counsel never asked Cooper whether she testified against the defendant, Wiggins, in consideration of having her sentence reduced.

## IV.

▆▆▆ Lastly, appellant argues that the trial court erred in sustaining the State's objection to appellant's questioning of Noblitt regarding whether the police investigation had disclosed appellant's fingerprints on the victim's vehicle. The subject of fingerprints first came up on cross-examination of Noblitt:

[Defense Counsel]: Is it accurate to say that there was (sic) no fingerprints of Bernard Wiggins found in the decedent's vehicle at any time?

[Prosecutor]: Objection.

[The Court]: All right. That's sustained.

This exchange is one in a series in which the prosecutor objected to a question regarding fingerprints and the court sustained the objections. In another exchange, the following took place:

[Defense Counsel]: Isn't it a fact that the fingerprints that were identified at that particular location were of Mr. Gough and Mr. Jennifer?

[Prosecutor]: Objection, and move to strike the question.

[The Court]: That's sustained.

[Defense Counsel]: Did there ever come, in your capacity as lead investigator, a time that you ever received any information that the fingerprints of Bernard Wiggins were found at the Brinkley Road address?

[Prosecutor]: Objection.

[The Court]: That's sustained.

[Defense Counsel]: May we approach the bench?

[The Court]: Come on up.

[Defense Counsel]: Could I ask for the basis?

[The Court]: The basis of the objection is you are outside the scope of the direct examination.

[Defense Counsel]: Well, we have two ways of doing it, and I don't want to inconvenience him.... You can either allow me some latitude in my cross, or alternatively, I will ask the Court to hold him as a witness so I can call him in the defense case.

[Prosecutor]: Fine. The reason I am objecting—I am not objecting because it's beyond the scope. I am really objecting—which it is—it's classic hearsay. Just because he is the lead investigator, doesn't mean he can testify to everything that occurred in this case. Only what he has personal knowledge of.

[The Court]: All he has testified to is what he took out of that apartment.

[Defense Counsel]: I understand, and he is also lead investigator, and part of the lead investigator's testimony has been—

[The Court]: If she makes an objection, I am going to rule.

Defense counsel went on to establish that no fingerprint analysis was performed on many of the seized items that allegedly belonged to the victim. The State did not object to any of the following questions: "Was there any fingerprint analysis done on that safe?"; "Did you do any fingerprint work on the various pages that are contained in this book?"; "And did you do any fingerprint analysis on those

items?"; "And there were no fingerprints that belonged to the decedent found on those proof sets, were they?"; "There was no fingerprint analysis done on any of these items that allegedly belonged to the decedent, was there?". Then there was a discussion of the vehicle. The following ensued:

[Defense Counsel]: Now, you did not personally examine the vehicle that Mr. Jennifer was driving?

[Noblitt]: No sir.

[Defense Counsel]: Who did?

[Noblitt]: As I recall, sir, that was Detective Otis Fickling of the Prince George's County Police Evidence Section . . .

[Defense Counsel]: Who directed Detective Otis Fickling to examine the vehicle?

[Noblitt]: I did.

[Defense Counsel]: As lead investigator?

[Noblitt]: That's correct.

[Defense Counsel]: Did he report back to you as to any information linking the vehicle to Mr. Wiggins in terms of fingerprints?

[Noblitt]: As I recall, no, sir.

Then there was a discussion of other evidence, and the last question asked by defense counsel was the question that elicited the unfavorable ruling of which he complains.

While no basis was offered for the objection, it is clear to us that the objection was properly sustained, especially when viewed in context with the trial judge's previous rulings when the State objected. The question called for hearsay. Noblitt had earlier testified that he did not personally examine the vehicle. Therefore, he could not have testified from personal knowledge whether examination of the car had disclosed or failed to disclose appellant's fingerprints.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY THE APPELLANT.

BLOOM, J., dissents.

BLOOM, Judge, dissenting.

I find myself in agreement with appellant and at variance with my colleagues. In my opinion, the trial court committed two errors that require reversal: (1) unduly restricting cross-examination of a key prosecution witness and (2) admitting into evidence certain objects unlawfully seized from appellant's apartment or photographs thereof.

I

A brief restatement of some of the facts may help to explain my reasoning on the cross-examination issue.

Bjorn Haug was robbed, kidnapped, and murdered, and his apartment was burglarized. Three people, Erik Jennifer, Juan Gough, and Jacquelyn Cooper, admitted that they had participated in the crimes; all three of them implicated appellant, who shared an apartment with Gough and Cooper, as the person who planned the robbery, committed the murder, and joined with them in the burglary. Jennifer did not testify against appellant; Gough and Cooper, who, pursuant to plea bargains pleaded guilty to crimes other than murder, testified against appellant at this trial as well as at the first trial.

The error asserted by appellant occurred during the testimony of Ms. Cooper. The majority opinion states that Cooper's plea bargain included an exchange of testimony against appellant for a lenient sentence. An inference may possibly be drawn to that effect, but there is nothing in the record of this case to support it, and that deficiency in the record forms a basis for appellant's complaint. What the State brought out during direct examination of Ms. Cooper is that there was a plea agreement, under the terms of which she pleaded guilty to kidnapping, theft, and burglary, and her sentence was capped at 35 years. On cross-exami-

nation, Ms. Cooper testified that she had been informed by the State's Attorney that the penalty for first degree murder was life imprisonment. Not a word was said about any obligation to testify against appellant as part of the plea bargain; all that the testimony discloses about the plea agreement is that pleas of guilty to crimes other than murder were exchanged for a sentence cap of 35 years.

Continuing his cross-examination of Ms. Cooper, defense counsel established that the actual sentence imposed was 25 years, ten years less than the stipulated maximum. But when defense counsel asked whether that sentence was ever reduced, the State objected and the court sustained the objection. By that time, the witness had answered the question in the affirmative, and that answer stood because there was no motion to strike it. What is important to the issue raised by appellant is the reason given by the court for sustaining the objection:

> The only thing that goes to motivation is what she was promised. She was promised a cap no more than 35 years. It doesn't make any difference what she got. The objection is sustained.

Appellant was thus effectively precluded from pursuing the matter of the sentence reduction, because the court ruled that evidence pertaining to that matter was irrelevant.

The majority concludes that the witness's testimony—plea bargain, 35–year cap, 25–year sentence, "It [that sentence] was reduced"—can be interpreted in either of two ways: (1) her sentence was reduced from 35 to 25 years; (2) her 25–year sentence was reduced. With all due respect for my colleagues, I submit that Ms. Cooper's testimony can only be interpreted as an acknowledgment that after she received a sentence of 25 years on her guilty pleas to kidnapping, theft, and burglary (the 35–year cap was not a sentence) that 25–year sentence was reduced. By how much? When? Before or after she testified against appellant? Why? As a *quid pro quo* for her testimony? Appellant was precluded from asking those questions by the court's ruling that the only relevant evidence as to the

witness's motive to testify against appellant was the 35–year cap. That ruling was patently wrong!

It is well established that a witness may be questioned regarding his credibility, his memory, his knowledge, or any possible bias. *State v. Cox*, 298 Md. 173, 468 A.2d 319 (1983). The United States Supreme Court in *Delaware v. Van Arsdall*, 475 U.S. 673, 678–79, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674, 682–83 (1986), stated that the confrontation clause of the Sixth Amendment, made applicable to a state criminal defendant by the Fourteenth Amendment, allows a defendant the right to cross-examine witnesses regarding matters which affect the witnesses' bias, interests, or motive to falsify. Article 21 of the Maryland Declaration of Rights affords the same protection. *Hopper v. State*, 64 Md.App. 97, 104, 494 A.2d 708 (1985). It is true that the trial judge retains wide latitude in imposing limits on cross-examination, based on concerns of harassment, prejudice, relevancy, confusion of the issues, and the witness's safety. A trial judge may not, however, limit cross-examination before the defendant has reached his "constitutionally required threshold level of inquiry." *Brown v. State*, 74 Md.App. 414, 419, 538 A.2d 317 (1988).

The Court of Appeals, in *Smallwood v. State*, 320 Md. 300, 577 A.2d 356 (1990), recently discussed the issue of cross-examination of witnesses for matters affecting bias or prejudice:

> In *Franklin v. State*, 239 Md. 645 [212 A.2d 279] (1965), we held that the right to cross-examine in general is inherent in the right to confront witnesses. More specifically, in *Hopper v. State*, 64 Md.App. 97 [494 A.2d 708] (1985), the Court of Special Appeals held that Article 21 of the Maryland Declaration of Rights affords defendants in Maryland the right to cross-examine for matters affecting bias or prejudice to the extent provided by the Sixth Amendment. *See also, Brown v. State*, 74 Md.App. 414, 419 [538 A.2d 317] (1988).
>
> The right to cross-examine is not without limits, however, and "trial judges retain wide latitude insofar as the

Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant...."

A judge must allow a defendant wide latitude to cross-examine a witness as to bias or prejudice ... but the questioning must not be allowed to stray into collateral matters which would obscure the trial issues and lead to the factfinder's confusion....

An appellate court must therefore determine "whether, assuming that the damaging potential of the cross-examination were fully realized, ... the error was harmless beyond a reasonable doubt." ... [A]n error will be harmless if the appellate court is "satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict."

*Id.*, at 306–308, 577 A.2d 356 (citations omitted). In *Smallwood,* the trial court prohibited questioning of a witness regarding the outcome of earlier charges wherein she had sworn out a warrant against the defendant. Defendant was attempting to prove that the witness had been unsuccessful in obtaining convictions of the defendant in previous cases, and thus had a motivation for testifying as she did in that case. The Court found error, and it found that error to be harmful. We had earlier held, in *Brown v. State,* 74 Md.App. 414, 538 A.2d 317 (1988), that for the purposes of cross-examination of a prosecution witness in order to show bias or motive, the crux of the inquiry insofar as its relevance is concerned, is the witness's state of mind.

What is essential to the preservation of the right to cross-examine is that the interrogator be permitted to probe into whether the witness is acting under a hope or belief of leniency or reward.

*Id.*, at 420–21, 538 A.2d 317 (quoting *Fletcher v. State,* 50 Md.App. 349, 359, 437 A.2d 901 (1981)).

In *Fletcher, supra,* the State's witness claimed he was hired by the defendant to move a stolen vehicle. During Fletcher's trial, the witness testified that he had been charged in the case, denied having made any deal with the state, and stated that he had already been tried. He was asked if he had been promised a "lesser sentence" to testify against Fletcher, and his reply was non-responsive. Upon further probing, he stated that he was not made any promises by the State. Counsel for Fletcher continued questioning the witness in an effort to determine whether his sentence was pending, but the trial court did not allow any questions regarding his sentence. We reversed Fletcher's conviction, stating:

> What counts is whether the witness may be shading his testimony in an effort to please the prosecution. "A desire to cooperate may be formed beneath the conscious level, in a manner not apparent even to the witness, but such a subtle desire to assist the state nevertheless may cloud perception."

> It is easy to see how the witness could have concluded logically that his failure to testify as he had promised or as was expected of him might have adverse consequences.

*Id.,* at 359, 437 A.2d 901.

In the case *sub judice,* the jury heard the witness's response, that she did in fact receive a reduced sentence. Inferentially, that was after she testified against appellant in the first trial. That response was not stricken. The court refused to permit the defense to explore the connection between that reduction of sentence and the witness's testimony. It is true that the jury was aware of the plea bargain "cap" of a 35–year sentence, but on the basis of the evidence that "cap" does not appear to be a motivation to testify. The extent of her sentence reduction after her testimony, and whether the reduction was a reward for her testimony, are certainly relevant and do have a bearing on the credibility of her testimony. To the jury, the 35–year

"cap" would seem to be a consideration for the guilty pleas, not for testimony.

The majority notes that appellant did not proffer either the extent of the reduction of Cooper's sentence or that he did not know the extent of the reduction. From that it concludes that it cannot tell whether the court's ruling prejudiced appellant. I fail to see the logic of that conclusion. The court had ruled that any reduction in the witness's sentence was irrelevant. In the face of that ruling, a proffer as to the extent of the sentence reduction would have been meaningless.

Finally, the majority, in a footnote, refers to an instruction by the court, apparently referring to Gough and Cooper, to the effect that they pleaded guilty to various crimes as a result of a plea agreement, "that is, a promise was given by the State to them that certain things would be done if they would testify in this case." The jury was told to consider such testimony with caution because it might be colored by a desire to gain leniency by testifying against appellant. I am not persuaded that that instruction cured the error in limiting cross-examination of Ms. Cooper. After all, as to that witness, the court had prevented the jury from hearing evidence of an agreement to testify as a *quid pro quo* for leniency or a reduced sentence. In the absence of such evidence, the court's reference to a plea agreement involving an obligation to testify did not appear to apply to Ms. Cooper's testimony.

The testimony of Jacquelyn Cooper and Juan Gough, two admitted accomplices, was crucial to the prosecution's case because, as pointed out *infra,* only their testimony, and the admission of certain tangible items of evidence tending to corroborate it, connected appellant to the crime. Such being the case, I cannot be persuaded beyond a reasonable doubt that the court's error in refusing to permit appellant's counsel to explore a possible relationship between Ms. Cooper's testimony and the reduction of her sentence was harmless error.

## II

I agree absolutely with what the majority opinion sets forth under the headings "STANDARD OF REVIEW" and "PROBABLE CAUSE AND THE 'PLAIN VIEW' DOCTRINE." I also agree that, on the basis of the officer's testimony at the suppression hearing as to what he had learned before going to appellant's apartment, what he saw in plain view inside the apartment, and what he believed when he saw the items he seized,[1] Officer Noblitt had probable cause to seize the coin sets (only one of which, found on the floor in appellant's bedroom, was of major significance); the military flashlights (one of which was found in appellant's bedroom); the bottles of wine (only one of which was found in appellant's bedroom); and the Norwegian postage stamp. I further agree that Noblitt had probable cause to seize the "second" telephone (the one not listed in the warrant); the safe, its contents, and its handle; and the bloody mattress cover.[2] Since none of those items were found in appellant's bedroom, however, their presence in the apartment, in Gough's or Cooper's room or in common areas, confirms the admitted guilt of the accomplices without corroborating their testimony as to appellant's guilt. Finally, I agree with the majority that, although admission in evidence of the copper ashtray was error, that error, at least, was harmless.

Where I disagree with the majority is with respect to the seizure and then the admission into evidence of the brass Viking ship that was found on a nightstand next to appellant's bed; the Citizen watch, also found on a nightstand in appellant's bedroom; and the stamp album, found under appellant's bed.

---

**1.** These are first level facts, which the hearing judge found to be true.

**2.** There was some testimony about the mattress cover, but the object itself does not seem to have been put in evidence, possibly because of a concern that all or some of the parties involved had AIDS.

In view of the fact that none of the items seized (or photographs thereof) were exhibited to the suppression motion hearing judge, all he had to go on, just as all we have to go on, with respect to probable cause, was the testimony of Officer Noblitt. We give due deference to the judge's first level fact-finding, which includes his total acceptance of the officer's testimony as to what information he had, what he saw, and what he believed. We do not give deference to the judge's conclusion, or the officer's, that what the officer knew and saw constituted probable cause to believe that what he saw was evidence of crime. As to that, as the majority opinion points out, we must make our own independent constitutional assessment.

### *The Watch*

Officer Noblitt had been told by a friend of the victim that the victim had recently purchased a Citizen watch. The friend described the watch, according to Noblitt, as gold in color, thin square face, brown leather band. Noblitt described what he saw on the nightstand in appellant's bedroom merely as a Citizen watch. He seized that watch. Considering that Citizen is a very popular brand of wristwatch, it would not be reasonable for the officer to believe that a watch found in appellant's bedroom probably had been stolen from Haug, merely because it was made by the same manufacturer. I would concede that, if the Citizen watch on appellant's nightstand matched the description of Haug's watch that the officer had received from Haug's friend, Noblitt would have had probable cause, rather than mere suspicion or speculation, to seize it. Could the hearing judge infer or assume that if the officer seized the watch it must have matched the description he had been given? Can we, in the exercise of our constitutional duty to make an independent assessment of probable cause, make that assumption.[3] I do not believe so. The testimony of

---

[3]. It is interesting to note that at trial a witness who was familiar with the watch the victim bought shortly before he was murdered testified

Officer Noblitt that he saw a Citizen watch and seized it because he believed it had been stolen from the victim is simply inadequate to support a finding that the seizure was valid.

## The Viking Ship

Officer Noblitt testified at the suppression hearing that he saw, in plain view, on a nightstand in appellant's room, "a brass Viking ship." He offered no further description. He seized the object because Haug was of Norwegian extraction and, to the officer, Viking equaled Norwegian. Contrary to the majority opinion, the object was never described as a model of a Viking ship, merely as a "brass Viking ship." It was not described either as to size or as to any other feature that would suggest Norwegian memorabilia as distinguished from a brass knickknack or curio having no real association with Norway. Officer Noblitt did not testify at the suppression hearing that he saw any indication in Haug's apartment that Haug was a collector of Viking or Scandinavian memorabilia. He said that Haug had "Norwegian things." In my opinion, the connection between a brass object in the shape of a Viking ship and Haug's Norwegian ancestry is far too tenuous to support probable cause to believe the object had been stolen from Haug's apartment or was otherwise evidence of crime.

## The Stamp Album

Officer Noblitt, searching for items listed in the warrant, looked under appellant's bed. He said that he saw, under the bed, a stamp album, which he seized because he was aware that the victim, Haug, collected stamps and there was no indication that appellant was a stamp collector. If it were readily apparent to the officer, when he looked under the bed, that what he saw was a stamp album or, as he put

---

that he thought it had a metal band. It is even more interesting to note that the witness was not shown either the seized watch itself or a photograph of it to see if he could identify it.

it, a stamp collection book, I would agree that he had probable cause to seize it. But if he had to move the object, take it out from under the bed, before he could tell that it was a stamp album, the initial seizure—moving the object to examine it before he could tell it was a stamp album and thus probably evidence of or fruits of crime—was without probable cause, and thus unlawful. *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

My analysis of Officer Noblitt's testimony regarding his seizure of the stamp album, set forth in detail in the majority opinion, leads me to a different conclusion than that reached by the majority. Noblitt, when asked to state exactly what he observed when he looked under the bed, responded, "It's a large loose-leaf notebook type." Then in response to another question, he said that he could tell by looking at it, without moving it, that it was a stamp collection because:

> It was about this thick [indicating] and we could see that there were envelopes in, apparently, plastic covers which would indicate a stamp collection.

On cross-examination, Noblitt admitted that he had seen nothing like this "stamp collecting book" in Haug's apartment. Haug's stamp collection (or what was left of it) consisted of transparent envelopes or folders containing stamps.

I must confess that I know very little about stamp collecting. Some fifty or more years ago, the stamp albums with which I was familiar were bound books, and stamps were attached to the pages by gummed hinges. Perhaps a loose-leaf type book with transparent (plastic or cellophane) pages, or pages into which transparent envelopes or covers are inserted, is a modern kind of stamp album. But loose-leaf books containing transparent type pages, the edges of which would have been visible to Officer Noblitt when he looked under appellant's bed, are quite frequently used for photograph albums and for collections of baseball cards or similar items. Accepting the truth of Noblitt's testimony and applying to it my own independent constitutional as-

sessment, I conclude that what Noblitt saw under the bed was a loose-leaf binder suitable for and probably containing a collection of some kind. Knowing that Haug collected stamps and that various things had been stolen from Haug's apartment, Noblitt may very well have *suspected* that the blue loose-leaf book *might* be a stamp collection. I am not persuaded that he had a reasonable basis to *believe* that it *was* one until he removed it from under the bed and was able to verify his suspicion.

The conclusion I reach, therefore, making my own independent probable cause analysis, is that Officer Noblitt had probable cause to believe that the following items were evidence or fruits of crime: the silver coin sets, because they were distinctive and Noblitt noticed some of the sets were missing from the victim's apartment; the second telephone, because it bore the victim's phone number, of which Noblitt had independent information; the Norwegian stamp, because it was distinctive in character, out of place in appellant's bedroom, and obviously had a stronger connection to the victim than to appellant; the Roma champagne, because Noblitt had seen a rack of that very same type of champagne at the victim's apartment, with bottles missing from it; and the safe, because Noblitt had a statement from a participant in the crime that a safe had been taken and there was evidence in the victim's apartment that suggested that a safe had been removed.

While it may be true that champagne bottles and a telephone are not so distinctive in character that they might immediately lead one to believe that they are stolen, these items should not be viewed in a vacuum.[4] The facts available to Noblitt were sufficient to warrant him in the belief that those items had been stolen from Haug's apartment.

The warrantless seizure of some other items, however, was not or may not have been based on probable cause to believe that those items were evidence or fruits of crime:

---

4. *See Sanford v. State, supra.*

the blue, loose-leaf notebook, which may not have been readily identifiable as a stamp album while it was under the bed; the copper ashtray, which was clearly seized upon mere suspicion, there being nothing to suggest it was evidence or fruit of crime; the brass Viking ship, because the mere fact that the victim was of Norwegian extraction might give rise to speculation that the brass object in the shape of a Viking ship had been stolen from his home, but not probable cause to believe so; and the Citizen watch, because the mere fact that the victim had recently acquired a watch of a particular make furnishes no probable cause to believe that a watch described only as a watch made by the same manufacturer had probably been stolen from the victim.

## HARMLESS ERROR

The fact that I believe the court erred in admitting the brass Viking ship, the stamp album, and the watch does not in itself warrant a conclusion that the convictions should be reversed because of such error. Only when error results in substantial prejudice to the accused is reversal required. The improper seizure of evidence, however, may not be taken lightly. If unconstitutionally seized evidence has been erroneously received at the trial on the merits, prejudice is presumed. The State will be able to avoid reversal only by satisfying the appellate court beyond a reasonable doubt that the error was harmless. *Chan v. State,* 78 Md.App. 287, 552 A.2d 1351 (1989); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 *reh. denied,* 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967).

> The presumption of prejudice and the requirement of strong persuasion to the contrary is, of course, a sensitivity to the jury trial and the inability to know with any real degree of sureness what contaminating effect the improper evidence may have had on the jury's decision.

*Chan,* 78 Md.App. at 312, 552 A.2d 1351. Necessarily, in determining whether the error was harmless, an appellate court must consider whether the unconstitutionally seized

items were of any major significance to the prosecutor's case. In doing so, it must view the case without that evidence. In the case *sub judice,* without *any* of the items seized from appellant's room the State might not have sufficient evidence to support the convictions, because the only other evidence connecting appellant to the crimes was the testimony of appellant's alleged accomplices in the crimes, Gough and Cooper, both of whom described in detail the role appellant played in the commission of the crimes.

## CORROBORATION

A person accused of a crime may not be convicted upon uncorroborated testimony of an accomplice. *Brown v. State,* 281 Md. 241, 378 A.2d 1104 (1977); *Luery v. State,* 116 Md. 284, 81 A. 681 (1911); *Turner v. State,* 294 Md. 640, 452 A.2d 416 (1982). As pointed out by the Court of Appeals, there are two reasons for this rule: (1) the witness offering the testimony is admittedly contaminated with guilt, and (2) the possibility of an ulterior motive on the part of the accomplice who seeks to curry favor with both the prosecutor and the police in the hope of obtaining a lesser sentence or a reduced charge. Nevertheless, only slight corroboration is required. *Turner, supra,* at 642, 452 A.2d 416.

While corroborative evidence need not be sufficient in itself to convict, it must relate to material facts tending either (1) to identify the accused with the perpetrators of the crime or (2) to show the participation of the accused in the crime itself. If either of these is established with some degree of cogency, the trier of fact may credit the accomplice's testimony even with respect to matters as to which no corroboration was adduced. *See, e.g., Woods v. State,* 315 Md. 591, 556 A.2d 236 (1989); *Brown, supra; Wright v. State,* 219 Md. 643, 150 A.2d 733, *cert. denied,* 361 U.S. 851, 80 S.Ct. 112, 4 L.Ed.2d 90 (1959). The first factor was explained in *Samuels v. State,* 54 Md.App. 486, 459 A.2d 213 (1983), wherein we stated:

With respect to corroborative evidence tending "to identify the defendant with the perpetrators of the crime, '[i]t would be sufficient by way of corroboration for the state to show, by non-accomplice evidence, that the appellant was in the company of the perpetrators of the crime in the general vicinity of the crime scene and at about the time when the crime occurred.' "

*Samuels, supra,* at 492, 459 A.2d 213, citing *Jeandell v. State,* 34 Md.App. 108, 366 A.2d 79 (1976).

This case is a classic example of why corroboration is required. The State's principal evidence in the case *sub judice* was the testimony of two admitted participants in the murder, robbery, burglary, kidnapping, and theft, Cooper and Gough. Both may have testified against appellant in exchange for lenient sentences for their parts in the crimes. The State clearly met its burden of proving the *corpus delicti.* It established the fact that Haug was indeed dead, and that his death occurred under circumstances that indicated that it was caused criminally by someone. There is no question that the State corroborated the accomplices' testimony as to their guilt with evidence found both inside and outside of their apartment. The victim's body was discovered in the yard behind a building supply company, with a lead pipe embedded in his face, and with bloodied pipes nearby. Photographs of Haug's automobile, a 1983 Honda Prelude, a portable radio recovered from Haug's automobile, and gray work gloves identified by the alleged accomplices as having been worn by appellant on the night of the murder, were admitted into evidence.

Clearly, there was no evidence that met the first corroborative factor, evidence tending to identify appellant with the admitted perpetrators of the crimes; there was no non-accomplice evidence placing appellant in the company of Gough and Cooper at or about the time they were committing any of the crimes.

To establish the second corroborative factor, *i.e.,* to show appellant's participation in the crime itself, the State

presented evidence found inside appellant's apartment. We should be primarily concerned with those items, constituting fruits of the burglary committed after the murder of Haug, that were found in appellant's room, because those items would tend to connect him with the crime itself. The items found in Cooper's or Gough's rooms, or in areas common to all three tenants, however, would certainly corroborate their testimony as to their own participation in the crimes but would not directly corroborate appellant's involvement. Of the items seized from appellant's room—flashlights, watch, copper ashtray, Norwegian stamp, stamp collection book, champagne bottle, bicentennial coin set, and brass Viking ship, none of which were listed in the search warrant—I would concede that Noblitt had probable cause to seize the stamp, the bicentennial coin set, and the champagne bottle. Those items were in themselves sufficient to connect appellant with the crimes and thus to corroborate the accomplices' testimony. Nevertheless, I am not persuaded beyond a reasonable doubt that a jury would have convicted him on the basis of those items, without the other exhibits found in his room. Appellant might have been able to offer a plausible explanation for the presence of one of several bottles of stolen champagne, one of many stolen bicentennial coin sets, and one foreign stamp in his bedroom. These items, of no appreciable value, might have been given him by the admitted criminals after their successful raid on Haug's apartment. Each item added to that list makes any attempted explanation less plausible. Hardest to explain would be the presence of the stamp album under the bed. Believing that there is some reasonable possibility that introduction of the watch, the Viking ship, and the stamp album may have prejudiced appellant's defense, I am not persuaded that error in the introduction of those items was harmless.

For the reasons set forth above, I would reverse the convictions and remand this case for a new trial.